DREW, J.
11 Lake D’Arbonne Properties and Cen-terPoint Energy Arkla appeal a judgment finding that CenterPoint’s installation of a gas pipeline caused a roadbed failure in a Union Parish subdivision. We amend the judgment to increase the amount of damages awarded to Lake D’Arbonne Properties by $2,550.00, and we affirm the judgment as amended.
FACTS
Lake D’Arbonne Properties (“LDAP”) is the developer of a residential subdivision, Eagle Point Subdivision, that is along Lake D’Arbonne in Union Parish. Nathan Futch was hired by LDAP to clear the land and to construct the subdivision roads.
The road at issue measured approximately 6,000 feet in length. It contained several curves and undulated over several small hills before ending at a cul-de-sac. LDAP relied on Futch for the specifications of the road, and a surveyor, Jerry Ruggs, assisted in determining where to place the road. No engineer was consulted about the road.
The roadbed was built by Nathan Futch using clay in six-inch lifts. Futch took clay that was available on the job site and sloped it toward what would be the center of the road. The clay was then compacted by heavy equipment being driven across it. The next step in the process was to be the application of asphalt as the pavement structure for the road.
*592 LDAP contracted with CenterPoint’s predecessor, Reliant Energy Arkla (“Cen-terPoint”), to provide natural gas service to Eagle Point. In order for this service to be provided, a gas main pipeline needed to be installed along an easement that ran on the right side of the road, at a cost of 1 a$13,530.00 to LDAP. CenterPoint assigned the task to Digco Utility Construction (“Digco”), with which CenterPoint had a blanket construction contract. In September of 2002, Digco laid approximately 6,115 feet of gas pipeline along this road.
Thomas McCloud was a general foreman for Digco at the time of the project, although he was not present when the pipeline was being laid. McCloud described how a trenching machine dug a trench that was approximately three feet deep, and then a two-inch gas line was laid. The trench was backfilled by a backhoe, which then ran over the dirt to compact it. This compaction method was done according to Digco’s general procedure.
John Wortham was CenterPoint’s inspector on this particular job. His duty was to ensure that the contractor followed CenterPoint’s specifications. The original plan was to bore under several culverts in one section of the road. That was not possible, so Wortham contacted John Crow, an owner of LDAP, about trenching into the road’s shoulder in the area of the culverts. Crow then called Johnny Dollar, the other owner of LDAP. At first Dollar would not give his consent to this variation from the original plan, but he ultimately agreed when told that Wortham said he would make it good. Wortham measured the pipeline as being approximately 24 feet from the center of the road in the area over the culverts. McCloud measured the pipeline as being no closer than nine or ten feet from the edge of the road.
Futch recalled that the dirt used by Digco to backfill the trench collapsed in an area across the culverts during a heavy rainstorm that | ¡¡occurred the day after the pipeline was laid.[1] Some of the newly-laid pipeline was even exposed. Futch stated that CenterPoint was contacted about the problem, but nothing was done, so he drained the water from the trench, allowed it to dry, and then backfilled the trench. Futch also stated that on one occasion before the asphalt was poured, Center-Point returned to add soil to the trench, but the soil washed out.[2] Futch estimated he backfilled certain areas of the pipeline ditch two or three times.
LDAP hired Lincoln Asphalt Paving to lay two inches of asphalt on the roadbed that had been prepared by Futch. Lincoln did not guarantee its work in this instance, which was its typical practice when it had not constructed the roadbed. Lincoln normally used soil cement when building a roadbed. In November of 2002, as the asphalt was being laid on the left side of the road, Lincoln’s heavy dump trucks traveled over the right side of the road. Soon, areas on the right side of the roadbed began failing. Michael Bryan, Lincoln’s supervisor on the job, recalled that ruts that were four to five inches deep *593 had formed on the outside of the right side of the roadbed. Bryan thought these problems began in one of the culvert areas and continued past it. Bryan stopped the job, and alerted Futch.[3] Futch described some of the roadbed shifting into an area where the trench was 1 ¿located. Dollar described the problem as being six-and eight-inch drops in the right travel lane of the roadbed as it went across the culverts and continued past the culverts around a curve. McCloud recalled that the roadbed was rutted with tire tracks from the asphalt trucks.
It was suggested by Lincoln that soil .cement be added to the roadbed in order to stabilize the roadbed for the application of the asphalt. This suggested remedy cost $22,283.53 and was accepted by LDAP. The addition of the soil cement was limited to the right side of the road in the areas that failed. Dollar thought the soil cement went into an area from just before the culverts to an area after the bend following the culverts.
LDAP filed suit against CenterPoint and Digco asserting that substandard practices had been used in digging and installing the gas line, including digging too closely to the roadway and not properly compacting the dirt removed during the excavation process.
Cloyce Darnell, an expert witness on behalf of defendants and the only expert witness who testified at trial, blamed the roadbed failure on the material chosen by Futch to build the roadbed and on what Darnell considered to be insufficient compaction by Futch of the soil around the culverts. The trial court rejected Darnell’s conclusions and rendered judgment against CenterPoint and in favor of LDAP, awarding damages of $22,283.53. The claims against Digco were dismissed. CenterPoint and LDAP have appealed.
I .DISCUSSION
CenterPoint argues that the trial court was clearly wrong in assigning fault to it as the evidence demonstrated that the reason the road failed was because Futch used an insufficient material when building the roadbed and then did not properly compact the material. CenterPoint further contends that the trial court was clearly wrong in not assigning any fault to Futch. CenterPoint additionally argues that the trial court erred in failing to find that LDAP did not mitigate its damages. LDAP complains that it is entitled to additional damages, and that Digco should be held solidarily liable with CenterPoint for LDAP’s damages.

Liability

An appellate court may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Cole v. Department of Public Safety & Corrections, 01-2123 (La.9/4/02), 825 So.2d 1134; Stobart v. State, Dept. of Transp. and Dev., 617 So.2d 880 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cole, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989).
Cloyce Darnell, a civil engineer, was accepted as an expert in the design and building of roads. He explained that a road consists of the | (¡paving structure (as *594 phalt in this case), a base course, and then a subgrade. Testing was done on soil samples gathered by Darnell from the edge of the pavement on both sides of the road in an area over the culverts. The tests determined that the soil was sandy clay, with a classification of A-2-4. Darnell considered this material to be marginally suitable for subgrade, but not as the base course material. According to Darnell, the road lacked a proper base course, and, thus, it did not provide a sufficient roadbed structure.
Darnell thought that photos taken of the road showed a classic road base failure where the base “ruts up” underneath a heavy load. It was estimated that each dump truck loaded with asphalt weighed between 70,000 to 80,000 pounds. Darnell regarded the clay as material unsuitable to support the weight of the trucks while the left side of the road was paved. Based upon his examination of video of the road that had been taken during the asphalt work, Darnell could not find longitudinal cracks in the road base in the area of the culverts. These cracks would have indicated that the road had shifted into the pipeline ditch.
Darnell also took issue with the manner in which Futch had compacted the dirt in the area of the culverts. He believed that it was not possible to properly compact the dirt between the culverts simply by running a dirt buggy across it as Futch had done. We note Futch’s testimony that when the roadbed was being constructed, rocks were placed in the culvert area to maintain the stability of the dirt placed on top of the culverts.
|7For several reasons, Darnell concluded that the trenches did not contribute to or cause the roadbed failure. First, he noted that Futch had already backfilled and compacted the trenches before the paving began. Second, he pointed out that even if the trench had been excavated nine feet from the edge of the pavement, it was still far enough away not to affect the structural integrity of the road. He recalled building roads with adequate base materials that remained intact even when trenches were dug merely 18-24 inches from the road and then filled with non-dense materials. Third, Darnell explained that the primary purpose of a road shoulder is for driver safety, and that it does not provide the majority of lateral support for the road because pressure on the road is dissipated at an angle of 45 degrees.
The effect and weight to be given to expert testimony rests within the broad discretion of the trier of fact. Williams v. State Farm Mut. Auto. Ins. Co., 36,439 (La.App. 2d Cir.10/23/02), 830 So.2d 379.
The trier of fact may accept or reject any expert’s view, even to the point of substituting its own common sense and judgment for that of an expert witness where, in the fact-trier’s opinion, such substitution appears warranted by the evidence as a whole. See Evans v. Kilbert, 27,101 (La.App. 2d Cir.8/23/95), 660 So.2d 167.
Darnell visited the road one time, in the spring of 2004. He also examined photographs and video taken of the road. The only road samples he tested were taken from the area of the culverts. He did not perform any soil density tests to compare compaction in different areas of the road.
|sThe trial court accepted Darnell’s testimony as accurate, except for his ultimate conclusions. The court noted the testimony of other witnesses that the road was suitable for and was serving its intended purpose. The court reflected that it would be a coincidence that the road failure occurred only at the location where the trenching was done into the shoulder *595 of the road and nowhere else along the road.[4]
Fntch constructed the roadbed by dropping six-inch lifts, and then compacting the dirt on the roadbed and shoulder by running heavy equipment over it. Futch believed that even without performing a density test, he knew the density of the Eagle Point roadbed based upon his experience from building roads in Union Parish since 1969. A density test would have been required by the Town of Farmerville, which also required a road base of six inches of compacted iron ore or select material with soil cement.[5]
Futch did not perform any soil analysis of the roadbed. He simply used natural clay that was available nearby. Futch did not think that the roadbed originally needed to be constructed with soil cement in order for it to be sufficient to meet its intended purpose. Futch felt that he had the experience necessary to use the clay and save money. He never considered adding soil cement before the stability problems occurred.
| gFutch believed that the problems with the roadbed occurred because Digco had failed to properly compact the dirt it used to fill the trenches that had been excavated in the shoulder of the road as it crossed the culverts. He thought this made the road unable to withstand the weight of the asphalt trucks which traveled on it while asphalt was being placed on the left side of the road.
CenterPoint was certainly aware of the pitfalls of digging a trench in the shoulder of the road. Wortham remarked that when laying pipe along a state road, a utility company is not allowed to come past the bottom of the ditch and dig into the road bank. Wortham assumed the reason for this was because of compaction issues; nevertheless, no special compaction instructions were given to Digco despite their trenching into the shoulder of LDAP’s road. Digco simply compacted the backfill dirt over the pipeline by running a backhoe over it. McCloud testified that if CenterPoint had given them special compaction instructions, they would have followed them.[6] Otherwise, they followed their normal compaction procedure.
Futch explained that his efforts to refill the trench and compact the dirt did not succeed because the damage had already been done. He regarded the shoulder as being the brace of the road in that it provided lateral support. Futch added that laying the pipe in the shoulder would not have necessarily led to roadbed failure had the trench been properly backfilled and compacted.
Imlt is beyond coincidence that the roadbed failure occurred in the areas where a trench had been dug into the shoulder of the road.[7] Michael Bryan of Lincoln Asphalt Paving could not recall experiencing any trouble on the left side of the road, or anywhere else on the right side of the road. Moreover, soil cement was not originally added to the roadbed, *596 yet most of the right side of the roadbed remained intact despite the heavy trucks traveling on it. The only structural problems with the roadbed occurred near where the pipeline trench was dug into the shoulder.
Based upon our review of this record, we cannot conclude the trial court was clearly wrong in finding CenterPoint solely at fault for the roadbed failure, which occurred only in the area where the pipeline had been placed into the shoulder of the road.

Damages

The trial court concluded that LDAP failed to establish by a preponderance of evidence just what amount was to be paid in additional expenses relative to the damages it sustained. The trial court was clearly wrong in reaching this conclusion.
Futch charged $85.00 per hour to back-fill the ditches that formed after Digco installed the pipeline. He estimated that he spent 30-40 hours backfilling the ditch in the area where the roadbed had failed. Futch felt this work was necessary because he was afraid the ditches formed by soil settling and rain would weaken the roadbed.
InLDAP established by a preponderance of the evidence that it is entitled to an additional $2,550.00 in damages for the expenses incurred in attempting to fill these ditches.

Mitigation of Damages

An injured party has a duty to mitigate his damages. Aisole v. Dean, 574 So.2d 1248 (La.1991); Sepulvado v. Turner, 37,912 (La.App. 2d Cir.12/10/03), 862 So.2d 457. The victim has an affirmative responsibility to make every reasonable effort to mitigate damages, but the care and diligence required of him are the same as that which would be used by a man of ordinary prudence under like circumstances. Id.
There is nothing in this record which indicates that LDAP failed to take every reasonable step to mitigate its damages. Futch worked to keep the ditches that formed dry and filled with dirt. Cen-terPoint was aware of the ditch problems as Wortham testified that he had been dispatched to add dirt over the pipeline. We also note that the asphalt work on the road was stopped when problems appeared in the roadbed, and the addition of soil cement was limited only to the area where the roadbed had failed. This argument is without merit.

Digco’s Liabilitg

Digco pled the immunity provided by La. R.S. 9:2771 in its answer. That statute reads:
No contractor, including but not limited to a residential building contractor as defined in R.S. 37:2150.1(9), shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made |1?and if the destruction, deterioration, or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration, or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.
A contractor who strictly adheres to plans or specifications furnished to him is relieved of liability to third persons *597 when the contractor has no reason to believe that alleged deficiencies contained in such plans and specifications would lead to a dangerous condition. Dumas v. Angus Chemical Co., 31,399 (La.App. 2d Cir.1/13/99), 729 So.2d 624 (citing Arnold v. Our Lady of the Lake Hospital, 562 So.2d 1056 (La.App. 1st Cir.1990)).
The evidence established that the failure to compact the dirt properly after initially filling the pipeline ditch is what ultimately caused the road to fail. Digco compacted the dirt using its normal procedure. Although CenterPoint was aware of the danger of digging a trench into a road shoulder, it never instructed Digco to utilize any special compacting procedures. As such, the deficiency was due to the insufficiency of CenterPoint’s instructions. Digco is entitled to the immunity, and the trial court properly dismissed all claims against Digco.
DECREE
The judgment is AMENDED to increase the damage award to $24,833.53. As AMENDED, the judgment is AFFIRMED, at CenterPoint’s costs.

. Washout trenches also appeared on the left side of the road, where other utilities were laid, although these trenches apparently did not affect the road stability. McCloud testified that when he was in the subdivision after the road had been asphalted, he noted washed-out areas where the utility lines were on the left side of the road.

. Wortham stated that he put dirt over the pipeline in an area going down the first hill on the road within a few months after the pipeline was installed but before the asphalt was laid. The dirt washed out again, and when he returned to add more dirt, Lincoln Asphalt was adding soil cement to the road bed. Wortham mixed soil cement with the dirt but it still washed out again.

. Futch recalled that the landowners then called defendants.

. Digco began trenching into the shoulder approximately 150 feet before the culverts.

. Crow believed that the road was built to the specifications of Farmerville, and he thought Futch knew that the road was to be built so Farmerville could accept it in the event that LDAP wanted to dedicate the road. Dollar testified that when LDAP had developed another subdivision, Farmerville had accepted a section of a road that did not contain either soil cement or an iron ore base.

. McCloud believed that Digco would have been paid extra for any special compaction measures.

. We note that Wortham testified that there was also a soft spot in the road at the top of the hill before the culverts were reached.