GARRETT, J.
The plaintiffs, James A. Thomas and Sharon Thomas, appeal from a jury verdict and judgment which they claim awarded insufficient damages for his injuries resulting from an accident at work and for her loss of consortium. For the following reasons, we affirm in part, reverse in part, amend in part, and, as amended, affirm the trial court judgment.
FACTS
Mr. Thomas was employed as a forklift operator at Marsala Beverage Company in Monroe. His duties included loading and unloading trucks with a forklift, manually lifting kegs of beer and cases of drinks, and performing janitorial duties. If an employee worked a 40-hour week, the company would pay for 50 hours. On November 4, 2010, Mr. Thomas, who was 42 years old, was unloading cargo from the back of a tractor-trailer. The truck was owned by Werner Enterprises, Inc., and operated by Bryan Boyd. While Mr. Thomas was on the forklift in the back of the truck, Boyd pulled away from the loading dock, causing Mr. Thomas, still seated on the forklift, to fall several feet out of the back of the truck to the concrete pavement.
Mr. Thomas left work and drove himself to the office of the company doctor, Dr. George Ronald Woods. Mr. Thomas claimed he injured his neck, back, arms, *314 and legs. Dr. Woods ordered X-rays, which failed to show any fractures in Mr. Thomas's neck or spine. Mr. Thomas wanted to return to work in order to meet the 40-hour requirement to be paid for 50 hours. Dr. Woods released him to return to work. Mr. Thomas worked for several months after the accident performing janitorial duties. Due to his complaints of persistent pain, he continued going to Dr. Woods, who treated Mr. Thomas through January 2011. Mr. Thomas ceased working in February 2011, and filed a workers' compensation claim against Marsala. Mr. Thomas was seen by numerous doctors whose findings will be discussed below. In early 2014, Mr. Thomas was referred by his attorneys to a pain management specialist, Dr. Vincent Forte, who began treating him.[1]
In June 2011, the Thomases filed this tort suit against Boyd and Werner Enterprises seeking damages for pain and suffering and mental distress, medical expenses, lost wages and/or earning capacity, disability, and loss of consortium. Marsala's workers' compensation carrier, Louisiana United Businesses Association Casualty Insurance Company ("LUBA"), intervened to recoup workers' compensation benefits paid to Mr. Thomas. The plaintiffs, joined by LUBA, filed a motion for partial summary judgment, on the issue of liability, contending that there was no dispute that the accident was caused solely by the negligence of the defendants. The motion was granted. Accordingly, Werner and its employee were determined to be totally at fault in causing the accident. Issues pertaining to the claimed extent of injuries and damages would be determined at trial.
While the tort suit was pending, LUBA refused to cover some of the treatment sought by Mr. Thomas. In the workers' compensation court, Mr. Thomas filed a disputed claim in connection with some medical treatment recommended by Dr. Forte. A workers' compensation judge reversed an adverse ruling by the workers' compensation associate medical director and ruled that Mr. Thomas was entitled to additional injections. That matter was on appeal when the tort suit eventually went to trial. This court affirmed that decision in Thomas v. Marsala Beverage Co. , 50,062 (La. App. 2 Cir. 9/30/15), 179 So.3d 620. The defendants in this tort suit were not involved in the workers' compensation litigation and had no control over the course of Mr. Thomas's treatment.
This case was tried over numerous days in August 2015.[2] Both sides presented extensive evidence and testimony from numerous lay and expert witnesses. Voluminous exhibits were introduced into evidence. The plaintiffs' contention was that Mr. Thomas was totally and permanently disabled as a result of the accident, physically incapable of ever returning to any type of work, and in need of pain management treatment for the remainder of his life. The plaintiffs sought damages in excess of $2 million. The defendants urged that any injuries suffered by Mr. Thomas were not as severe or permanent as claimed by the plaintiffs and that Mr. Thomas was capable of working but simply refused to do so. According to the defendants, Mr. Thomas's continuing subjective complaints of constant and persistent pain were questionable because he exaggerated *315 and magnified his symptoms and had not been candid with the numerous healthcare providers.
On August 11, 2015, the jury returned a verdict finding that Mr. Thomas proved that he was injured by the accident, but he failed to mitigate his damages by 55%. He was awarded $40,000 for general damages, $34,977 for past lost wages, and $40,000 for past medical expenses. He was not awarded anything for future medical expenses, future lost wages, or loss of earning capacity. Mrs. Thomas was awarded $10,000 for loss of consortium. On September 14, 2015, the trial court signed a judgment incorporating the jury verdict and awarding Mr. Thomas $51,739.65 in total damages, after the 55% reduction for failure to mitigate, and $10,000 to Mrs. Thomas. The statutory lien in favor of LUBA was recognized, with its recovery to be considered later by the court.
The plaintiffs filed a motion for JNOV, claiming the jury verdict and trial court judgment were contrary to the law and evidence and an abuse of discretion. The motion was denied by the trial court. The plaintiffs appealed the final judgment and the jury verdict. They have not appealed the denial of the JNOV.[3]
On appeal, the plaintiffs argue that the jury erred in making abusively low awards for general damages, past lost wages and loss of consortium and in failing to make any award for future medical expenses, future lost wages and loss of future earning capacity. They maintain that the jury erred in finding that Mr. Thomas failed to mitigate his damages, which resulted in a reduction of his damage awards. Finally, they contend that the trial court erred in applying La. C.E. art. 414 in such a way as to unfairly restrict their ability to rebut inferences made by the defendants. To address the plaintiffs' arguments on appeal, we have conducted an exhaustive review of the lengthy trial transcript and voluminous exhibits. We note that this case was tried almost five years after the accident. During that time, Mr. Thomas was seen by numerous physicians, most of them in connection with his workers' compensation case. The defendants in this tort case were not parties to the workers' compensation case. Notably, the defendants marshaled and presented to the jury much evidence that contradicted many of the claims made by the plaintiffs. The jury was presented with a significant amount of evidence which cast doubt on the credibility and veracity of Mr. Thomas. Since his claims were, to a large extent, based upon subjective complaints of pain, it is apparent that the jury did not believe him or the symptoms he reported to physicians.
GENERAL DAMAGES
The plaintiffs argue that the general damage award of $40,000 to Mr. Thomas was abusively low and should be raised to $400,000. This argument is without merit.
Legal Principles
In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion is left to the judge or jury. La. C.C. art. 2324.1. General damages are intended to compensate an injured plaintiff for mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Duncan v. Kansas City Southern Ry. Co. , 2000-0066 (La. 10/30/00), 773 So.2d 670 ; Fuller v. D.L. Peterson Tr. Co. , 50,699 (La. App. 2 Cir. 6/22/16), 197 So.3d 244, writ denied , *316 2016-1658 (La. 1/9/17), 208 So.3d 369 ; Young v. Marsh , 49,496 (La. App. 2 Cir. 11/19/14), 153 So.3d 1245.
There is no mechanical rule for determining general damages. The facts and circumstances of each case control. Terry v. Simmons , 51,200 (La. App. 2 Cir. 2/15/17), 215 So.3d 410. The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. LeBlanc v. Stevenson , 2000-0157 (La. 10/17/00), 770 So.2d 766 ; Fuller v. D.L. Peterson Tr. Co. , supra. The nature, relative severity, and extent of bodily injuries are qualitative factors that must first be considered by the trier of fact in awarding general damages. The duration of a plaintiff's injury symptoms and the duration of treatment are quantitative factors that must also be taken into account. Since the jury is in the best position to evaluate witness credibility and see the evidence firsthand, it is afforded much discretion in independently assessing the facts and rendering an award. Fuller v. D.L. Peterson Tr. Co. , supra.
The assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a factual determination entitled to great deference on review. As such, the role of the appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn v. Maritime Overseas Corp. , 623 So.2d 1257 (La. 1993), cert. denied , 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed. 2d 379 (1994). Before a trial court's award of general damages can be questioned, the reviewing court looks first, not to prior awards, but to the individual circumstances of the instant case. If there is no abuse of the trial court's vast discretion, the damage award will not be disturbed by the reviewing court. This vast discretion is such that the appellate court should rarely disturb an award of general damages. Young v. Marsh , supra .
Evidence
Mr. Thomas testified at trial that he dropped out of school in the eighth or ninth grade and started working in his teens, holding a variety of jobs.[4] Approximately nine years before this accident, he had an unrelated workers' compensation claim against a different employer resulting in surgery for tendinitis in his elbow. Mrs. Thomas was employed as a nurse, and, between them, they had five children.
In describing the accident at trial, Mr. Thomas said that the truck pulled away, and he and the forklift rolled out of the back of the truck and dropped.[5] He heard a bang and then claimed he was unconscious. After the accident, Mr. Thomas left work alone and went to the company physician. He returned to work after the accident and worked for several months in pain because he could not take pain medication and do his job. He continued to consult with Dr. Woods during this time. He stopped working in February 2011, and has not worked since that time. He was later referred to other physicians.
Mr. Thomas eventually had surgery for carpal tunnel syndrome in both hands. Although he tried to tie this surgery to the *317 forklift accident, the evidence indicated that it was not related.[6] He also had physical therapy for his back, which he did not feel was beneficial. After seeing numerous doctors, Mr. Thomas was prescribed pain medication, which he claimed made his legs and feet swell.
Mr. Thomas testified that he has been taking pain medication and muscle relaxers since the accident and these medications limit his ability to drive. He outlined the numerous physicians he consulted and said that, at one time, he had to go several months without pain medication because he did not have a physician to prescribe it. He was informed he reached maximum medical improvement in November 2014. He claimed he had no physical limitations before the accident and now cannot work at all. Mr. Thomas maintained that he became withdrawn after the accident and was angry, upset, and suicidal. He explained to the jury that at one point:
The first two years of the accident, I shut everybody out. I couldn't do anything but just be there. I didn't attend-I mean, I didn't attend nothing. I just-like I was just vanished from the face of the earth.
He claimed he can only sleep in a recliner. He cannot take care of his lawn and takes all day to sweep and mop the house. He cannot drive long distances and sometimes blacks out.
Mr. Thomas opened a Facebook account in 2012 or 2013 and began posting pictures of various events. The defendants obtained these documents and introduced over 70 Facebook postings. These were used extensively in the cross-examination of Mr. Thomas. The postings showed that numerous out-of-town trips were being made to concerts, sporting events, amusement parks, and other activities, while Mr. Thomas claimed to be incapacitated. Mr. Thomas tried to minimize his participation in the activities by claiming that he used elevators in the stadiums to get to his seats.[7] He also claimed it was only after receiving an ultimatum from his wife that he began going on the outings and vacations. He stated that his wife does all the *318 driving because he cannot drive long distances due to his medication.
Mr. Thomas was also cross-examined about his income tax returns, which showed that, for several years, he claimed a nephew as a dependent and listed him as his son, even though the child did not live with him. By falsely claiming this child, Mr. Thomas improperly received the benefits of the "earned income credit."
Captain Eugene Ellis of the Monroe Police Department is Mr. Thomas's cousin. He said that, after the accident, Mr. Thomas's personality changed and he was withdrawn. However, he had not seen Mr. Thomas in several years.
Earl K. Burks is the pastor of the church Mr. Thomas attended at the time of the accident. He testified that, prior to the accident, Mr. Thomas was very active in the church, but stopped attending several months after the accident. Burks had not personally visited Mr. Thomas since that time.
James Thomas, Jr., Mr. Thomas's son, was questioned by the defendants about a Facebook post he made in December 2010, commenting on a basketball game he played with his father. Although the son claimed he made up the game to impress his girlfriend, the jury may have interpreted his testimony as another example of Mr. Thomas engaging in activities while claiming otherwise to doctors and others.
Bryan Boyd, Werner's truck driver who was involved in this accident, testified that on the day of the incident, he backed his trailer up to the loading dock and then later pulled away from the dock and parked. He walked to the back of the trailer and noticed that product was still in the trailer. He saw Mr. Thomas sitting on his forklift. Mr. Thomas asked if he knew he was sitting in the trailer when the truck pulled away. Boyd said that he did not. According to Boyd, Mr. Thomas then walked out and got into his vehicle with no visible signs of injury or complaints.
In connection with the workers' compensation claim, LUBA required that Mr. Thomas see Dr. Donald Smith, a neurosurgeon, for a medical examination. Mr. Thomas claimed that, on his first visit, Dr. Smith "rollerbladed" into the waiting room of the office, did a limited examination, and told Mr. Thomas to return to work. Later, he was again seen by Dr. Smith. Mr. Thomas said his wife dropped him off at the door of the office and before she could park and come back inside, Dr. Smith had completed his exam.[8]
Dr. Woods, the first doctor to see Mr. Thomas in connection with this accident, testified.[9] He is a family practice physician. Mr. Thomas complained of neck and back pain, as well as pain in the arms and legs. Dr. Woods noted tenderness and a decreased range of motion in Mr. Thomas's neck. He did not have numbness at that *319 time. Dr. Woods initially diagnosed Mr. Thomas with cervical and lumbar spine strain. He ordered X-rays, which did not show any fractures. He prescribed muscle relaxers, anti-inflammatory drugs, and pain relievers. Mr. Thomas wanted to return to work and Dr. Wood authorized light-duty work.
Dr. Woods saw Mr. Thomas on November 8, 2010, four days after the accident. Mr. Thomas was still complaining of pain. Dr. Woods saw Mr. Thomas again on November 17, 2010. His neck was better, but he had lower back pain and limited range of motion in his back. Dr. Woods gave Mr. Thomas an injection of steroids in his back. Mr. Thomas again went to Dr. Woods on November 29, 2010. He had back pain and elevated blood pressure. On December 1, 2010, MRIs were done on Mr. Thomas's neck and back. The MRI on the back showed no herniation or stenosis.
On January 6, 2011, Mr. Thomas visited Dr. Woods complaining of back pain radiating into his left knee and foot. Although he had symptoms of a herniated disc, this did not show on the MRI. Mr. Thomas was given another steroid injection.
Mr. Thomas saw Dr. Woods on January 27, 2011, complaining of back pain. Dr. Woods suggested that he see a pain management specialist. It appears that the referral was initially blocked by LUBA, but Mr. Thomas was eventually able to see Dr. Douglas Coleman Brown, an orthopedic surgeon.
Dr. Brown testified that he saw Mr. Thomas in February 2011. Dr. Brown thought that the facet joints in Mr. Thomas's back took the impact of the fall. He determined that Mr. Thomas had an impaction injury to the facet joints at the L4-5 and L5-S1 levels of his spine. Mr. Thomas described a burning pain in his back with numbness behind his left knee and heel. He described his pain level as three on a ten-point scale.
Dr. Brown injected Novocaine and cortisone into the joints in four locations on Mr. Thomas's back. The injections gave him some relief, but LUBA refused to authorize additional injections. LUBA also declined coverage for injections later recommended by Dr. Forte, discussed below. This issue was eventually resolved in favor of Mr. Thomas in Thomas v. Marsala Beverage Co. , supra.[10]
On May 9, 2011, Dr. Brown observed that Mr. Thomas had developed a bone spur in his back, related to trauma. He noted that Mr. Thomas had some age-related arthritic changes in his back, but opined that trauma can accelerate arthritis. Dr. Brown ordered a functional capacity evaluation ("FCE") and recommended work hardening and occupational therapies. Mr. Thomas had dangerously elevated blood pressure during the FCE and was not able to complete the test. Dr. Brown was not aware that the test had *320 been terminated.[11]
Dr. Brown referred Mr. Thomas to Dr. Marco Ramos, a neurosurgeon. Dr. Ramos first saw Mr. Thomas in August 2011. He noted that Mr. Thomas had no history of back pain prior to the accident. He thought that Mr. Thomas had cervical and lumbosacral radiculopathy. Mr. Thomas underwent electromyography ("EMG") testing in 2011 and 2013. Neither of these tests showed any evidence of cervical radiculopathy. Dr. Ramos prescribed a muscle relaxant, an antidepressant, and pain medication. Dr. Ramos observed that Mr. Thomas had carpal tunnel syndrome and vascular pathology in right lower extremity. He did not think the vascular pathology was related to Mr. Thomas's injuries, but he did think the carpal tunnel syndrome was caused by the forklift accident.
When Dr. Ramos saw Mr. Thomas in November 2011, he had limited range of motion with tenderness over the suboccipital and paravertebral muscle groups. His pain was mostly in his neck. Dr. Ramos recommended physical therapy, which Mr. Thomas did not think helped him. He last saw Mr. Thomas in June 2013.
Dr. Smith, the neurosurgeon discussed by Mr. Thomas in his testimony above, examined him in 2011 and 2012, and reviewed his medical records and imaging studies on behalf of LUBA. Later, he also reviewed additional medical records sent to him by the attorneys for the defendants in this case. Mr. Thomas said his pain level was five on a ten-point scale. He had carpal tunnel syndrome, but Dr. Smith did not think that was related to the accident. Regarding Mr. Thomas's back complaints, Dr. Smith did not see any reason why he could not return to work without physical restrictions. Dr. Smith was later presented with Mr. Thomas's FCE by Dr. Green, showing that Mr. Thomas could perform only light-duty work. Dr. Smith said his opinion that Mr. Thomas could return to work without restrictions may have been overstated "at the level of work."
Dr. Curtis Partington, a neuroradiologist, testified by video deposition. He examines diagnostic imaging of the brain, spine, and spinal cord and gives independent medical reviews. He examined two lumbar MRIs and four cervical MRIs done on Mr. Thomas. The MRIs were done at various times from 2010-2013. He found only age-related changes in Mr. Thomas's neck and back. Dr. Partington did not find any diagnostic evidence to support a traumatic injury. He found no anatomical reason for Mr. Thomas's pain. He stated that some patients can have pain even when the cause does not show up on an MRI.
Dr. Eric Oberlander, a neurosurgeon, testified by video deposition. He saw Mr. Thomas in July and August 2013, at the request of the plaintiffs' attorneys. He performed tests for nerve root impingement and spinal cord compression, which were negative. Mr. Thomas had pain on palpation of the lumbar spine, with limited range of motion in his shoulder, but had a normal gait and normal MRIs. Dr. Oberlander also acknowledged that some patients can have pain, even though their MRIs are normal. He stated that, if Mr. Thomas had no symptoms before the accident and had pain after the accident, he was probably injured in the accident.[12]
*321 Dr. Benjamin Kidder, a neurologist, saw Mr. Thomas in 2013, on a consult from Dr. Oberlander. Mr. Thomas complained of back pain, numbness, tingling, leg pain, and blurred vision. Dr. Kidder observed that Mr. Thomas appeared to be in some pain when he walked. Dr. Kidder found no evidence of disc herniation, nerve root compression, or spinal stenosis. Although he could not find an anatomical reason for Mr. Thomas's pain, Dr. Kidder did not dispute that he was experiencing pain. Dr. Kidder prescribed a muscle relaxer and medication for nerve pain. Mr. Thomas found that the nerve pain medication actually increased his pain. He contacted Dr. Kidder about stopping the medication. Because medications were not helping Mr. Thomas, Dr. Kidder suggested that he see a pain management physician.
Dr. Vincent Forte, an expert in interventional pain management, began treating Mr. Thomas in January 2014, following referral by his attorneys. He complained primarily of neck pain radiating into his shoulders. Mr. Thomas reported headaches which interfered with his vision, along with swelling and numbness in his hands and arms. Mr. Thomas had undergone carpal tunnel surgery on both hands and several rounds of physical therapy with no reduction in pain.
Mr. Thomas reported pain radiating into his left leg with muscle spasms and limited range of motion in the lumbar region. Dr. Forte said this was indicative of underlying pathology in the lower spine. Mr. Thomas had tenderness in the bilateral upper trapezius and facet joints with no trigger points identified. He had limited range of motion in his back and neck. His straight-leg raise test was positive for pain radiating into his left leg. He reported his pain level to be four on a ten-point scale. Dr. Forte saw Mr. Thomas on 17 or 18 occasions and his pain level was consistently between two and four on a ten-point scale.
Dr. Forte recommended lumbar medial branch block injections. A series of injections was given on the right side of Mr. Thomas's spine in January 2014. Mr. Thomas reported a 50% reduction in his pain for a short time. A series of injections was administered on the left side of his spine resulting in a temporary 25% reduction in pain. Dr. Forte determined that the injections were not helping Mr. Thomas and no further injections were scheduled.
Dr. Forte prescribed several types of pain medications and said Mr. Thomas's dosages were stable and he was compliant in taking his medication. According to Dr. Forte, Mr. Thomas should not drive while taking pain medication.
By November 2014, Dr. Forte determined that Mr. Thomas had reached maximum medical improvement. He opined that Mr. Thomas had a serious injury caused by this accident and his condition could get worse as he ages. On cross-examination, Dr. Forte acknowledged that the facet joint changes were not unusual and spondylosis is age-related wear and tear. He also admitted on cross-examination that he was not aware of all the activities engaged in by Mr. Thomas that had been documented on the Facebook postings. He also admitted that he had numerous meetings with counsel for the plaintiffs without Mr. Thomas being present.[13]
*322 Dr. Ernest Green, an expert in physical therapy, examined Mr. Thomas in January 2015, and performed an FCE. He determined that Mr. Thomas was capable of light-duty work on a full-time basis. He noted that Mr. Thomas related to him that he was not interested in returning to any type of work or receiving rehabilitation services.
Angelique Liles, a physical therapist who treated Mr. Thomas in October 2011, found that his activity level was not consistent with the level of pain he reported. She explained that Mr. Thomas declined to do the recommended exercises and claimed they made his back and neck worse. Liles discharged Mr. Thomas from therapy because of his lack of effort, which prevented him from responding to treatment in a positive way.
Shortly after Mr. Thomas's physical therapy was terminated, a private investigator was hired to observe his activities. The investigator, Walter Delphin, testified that he followed Mr. Thomas three days in 2013, and three days in 2014. He observed him visit doctors' offices and drive-through windows at fast food restaurants.
Dr. E.H. Baker, a medical psychologist, evaluated Mr. Thomas in March 2015, on behalf of the plaintiffs. Mr. Thomas described the accident and outlined the symptoms he had and the physicians he had consulted. Dr. Baker administered the Minnesota Multiphasic Personality Inventory ("MMPI") to look for anxiety, depression, physical and somatic complaints. When Dr. Baker examined the test, the validity scales and consistency scores cast suspicion on the results. Dr. Baker also looked at the "lie scale," which was elevated, indicating that Mr. Thomas was trying to present himself in a "very, very positive light" with no psychological problems. This was inconsistent with the level of pain he claimed to be experiencing. Dr. Baker also examined the "infrequency scale," which was slightly elevated, and the "back infrequency scale," which was very elevated. Due to all these factors, Dr. Baker thought the test results were questionable. He stopped the test and readministered it on a *323 different day. The second test was also invalid and was more inconsistent. The results indicated that Mr. Thomas was exaggerating his symptoms and wanted others to think of him in a good light, but that he was "really in bad shape." However, Dr. Baker attributed the test results not to exaggeration, but to a lack of concentration caused by pain. Dr. Baker did not think that Mr. Thomas understood the questions. In connection with Dr. Baker's evaluation, Mrs. Thomas also filled out an evaluation regarding Mr. Thomas's abilities after the accident. Dr. Baker acknowledged that Mrs. Thomas's answers indicated that her husband was capable of doing more than he claimed.
Dr. Kevin Greve, a clinical neuropsychologist, evaluated Mr. Thomas shortly before trial on behalf of the defendants. Mr. Thomas said that, for two years after the accident, he neglected his family, stayed at home, and withdrew. At the time of the evaluation, Mr. Thomas reported that his pain was level ten on a ten-point scale. Dr. Greve observed that Mr. Thomas looked fairly comfortable and did not appear to have that level of pain, which would usually require a visit to the emergency room. Mr. Thomas reported that he was unable to do a number of things in everyday life. Dr. Greve opined that Mr. Thomas was magnifying and exaggerating his problems and that malingering "must be strongly considered." Dr. Greve concluded that Mr. Thomas's current clinical presentation was being influenced by potential secondary gain and was consistent with an intentional effort to appear more disabled than was the case. Dr. Greve noted that Mr. Thomas had been tested and evaluated previously by others and earlier testing did not show the degree of exaggeration that later testing did.
Dr. Baker was asked about the testing done by Dr. Greve, which showed that Mr. Thomas was overreporting in several different areas and exaggerating his pain. Dr. Baker did not feel that Mr. Thomas was deliberately inconsistent in his test answers. He continued to think that Mr. Thomas did not understand the questions. He suggested that Mr. Thomas receive counseling. On cross-examination, Dr. Baker said Mr. Thomas had related that it was difficult for him to travel long distances and that it was almost impossible for him to walk a block. Dr. Baker stated that he would be surprised to know that Mr. Thomas had recently taken a trip to New Orleans.
Lenora Maatouk, an expert in vocational rehabilitation, evaluated Mr. Thomas on behalf of the defendants. She found that he read on a second grade level and performed math on a fifth grade level. He had an IQ of 80, which is below average. She stated there was no way to determine if Mr. Thomas was truthful on the tests. She noted that his reading scores were inconsistent with completing a phlebotomy course or running a candy business that was registered with the Louisiana Secretary of State. Maatouk opined that Mr. Thomas could find work as a short-order cook or could complete the requirements to become a phlebotomist, including obtaining a GED.[14] She determined that the average wage for a short-order cook was $8.35 per hour and the average wage for a phlebotomist was $12.83 per hour.
Jeffrey Peterson, the plaintiffs' expert in vocational rehabilitation, examined the medical records, income tax returns, the FCE by Dr. Green, the results of Maatouk's *324 testing, and other documents connected with this case. He never personally saw Mr. Thomas and only interviewed him by telephone. Peterson determined that Mr. Thomas is long-term totally and permanently disabled from work. Due to Mr. Thomas's low academic functioning and his physical limitations, Peterson found that Mr. Thomas was not able to return to work. He stated that there was not any job he could find that Mr. Thomas could do within his restrictions, which would allow him to return to work on a 40-hour per week basis, at a consistent and dependent level. Mr. Peterson said there was not anything he could see that would attract an employer to Mr. Thomas to hire him full-time.
Peterson observed that the FCE conducted by Dr. Green had a duration of only 2½ hours and he did not believe it was reflective of what Mr. Thomas could do in an eight-hour day, five days a week, 52 weeks a year. This observation by Peterson was completely contrary to the conclusion reached by Dr. Green that Mr. Thomas could perform light-duty work on a full-time basis. Peterson found that Mr. Thomas could not do sedentary work due to his academic limitations. He did not think Mr. Thomas could get a GED or complete the requirements to work as a phlebotomist. With the medication he takes, Mr. Thomas could not drive or operate heavy equipment. Peterson did not think Mr. Thomas could work as a short-order cook because that requires standing for long periods of time.
Discussion
The jury made a finding that Mr. Thomas was injured in this accident and awarded $40,000 for general damages. Under the facts outlined above, all of the conflicting evidence shows that the jury was presented with the picture of a plaintiff who was initially injured in the accident, but whose injuries were not particularly severe and were, to some extent, exaggerated. Further, the jury was presented with substantial evidence showing that Mr. Thomas's testimony was not consistent in many respects. The Facebook posts described above clearly show an activity level inconsistent with information he provided to the doctors. Mr. Thomas's description of the severity of the accident frequently changed. Immediately after the accident, he told Dr. Woods that he was operating a forklift in an 18-wheeler, when the truck drove forward causing the forklift to fall forward and hit the ground while Mr. Thomas was on it. He told Dr. Brown that the 18-wheeler pulled off and the forklift, with Mr. Thomas aboard, dropped the height of the loading dock, down to the concrete. He said he was jarred and it bounced a couple of times. He told Dr. Ramos that the forklift came out of the back of the truck and fell eight or nine feet, landed on the back wheels, and then the front wheels, violently. Mr. Thomas told Dr. Forte that the forklift fell from the loading ramp and bounced several times, causing his head to hit the top of the forklift and causing him to bounce up and down within it. According to Dr. Baker, Mr. Thomas said that a truck pulled forward causing the forklift to fall backwards off the loading dock with him on the forklift. He was either unconscious or shaken and took awhile to "come to." Dr. Oberlander's notes reflected that the accident occurred when Mr. Thomas was unloading a truck and another employee pulled out with a forklift and hit Mr. Thomas in the head.
Mr. Thomas was also inconsistent about his educational level. He testified at trial he dropped out in the eighth or ninth grade. In his deposition, he said he had an 11th grade education. He told Dr. Kidder that he attended Richwood High School *325 through the 12th grade. He told Ms. Maatouk that he did not remember the name of the high school he attended. Additionally, the jury was presented with evidence that Mr. Thomas filed fraudulent income tax returns on more than one occasion.
There is ample evidence in this record for a jury to find that, while Mr. Thomas initially experienced some pain from this accident, he was not injured severely enough to produce any objective findings in the numerous MRIs done on his neck and back. While Mr. Thomas contends that he still suffers severe pain in his neck and back, cannot do yard work, and takes a long time to sweep and mop his house, the jury also saw evidence and heard testimony that he could ride long distances on numerous trips and could sit through ballgames and concerts. It is apparent that the jury had issues with Mr. Thomas's credibility and the record provides ample support for such a determination. It is also apparent that many of the health care providers being seen by Mr. Thomas were unaware of his actual activity level. The total picture presented to the jury was of an individual who initially experienced some injury and pain as a result of this accident, but did not suffer long-term, severe injury, pain and suffering, or loss of enjoyment of life. Based upon this record we do not find that the trial court and jury were manifestly erroneous or clearly wrong in setting the award for general damages at $40,000.
FUTURE MEDICAL EXPENSES
The plaintiffs argue that the jury erred in failing to make any award for future medical expenses. Because the jury found that Mr. Thomas was injured in the accident and the uncontroverted medical evidence shows the he will require medical exams, treatment, and medication for the remainder of his life, the plaintiffs argue the jury erred in failing to make an award for future medical expenses. This argument is without merit.
Legal Principles
Under Louisiana law, a tort victim may recover past and future medical expenses caused by tortious conduct. The victim must, however, establish that he incurred past medical expenses in good faith as a result of his injury and future medical expenses will more probably than not be incurred. A plaintiff shows the probability of future medical expenses with supporting medical testimony and estimations of their probable cost. Menard v. Lafayette Ins. Co. , 2009-1869 (La. 3/16/10), 31 So.3d 996 ; Terry v. Simmons , supra . The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that the future medical expenses will be medically necessary. Menard v. Lafayette Ins. Co. , supra.
In accordance with well-established law, much discretion is left to the judge or jury in its assessment of quantum, both general and special damages. La. C.C. art. 2324.1. Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review. Menard v. Lafayette Ins. Co. , supra .
An appellate court, in reviewing a jury's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. This test requires a reviewing court to do more than simply review the record for some evidence which supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly *326 wrong or manifestly erroneous. The issue to be resolved on review is not whether the jury was right or wrong, but whether the jury's fact finding conclusion was a reasonable one. Menard v. Lafayette Ins. Co. , supra .
Discussion
Although the jury found that Mr. Thomas was injured in the accident, it only awarded $40,000 for past medical expenses.[15] That award has not been appealed. The plaintiffs argue only that the jury erred in failing to make any award for future medical expenses.
Much of the testimony and evidence dealing with whether Mr. Thomas requires future medical treatment for the remainder of his life as a result of the accident is fully set forth above. The plaintiffs also introduced an exhibit from Dr. Forte's office outlining future medical costs. It specified monthly visits for medical review at $47 per visit, with follow-up appointments costing from $161 to $331, depending on the level of the visit. It included $510 for analyzer drug testing, to be done up to four times per year to assure that Mr. Thomas was not abusing his pain medication. Confirmation testing costing $3,268 might be necessary, depending on the outcome of the analyzer tests. Dr. Forte included the cost of "confirming nerve block" injections at $2,565 for professional services, and $5,422 for facility charges.
The deposition of Dr. Charles Bettinger, a forensic economist hired by the plaintiffs, was presented to the jury. He calculated the cost of future medical expenses. He used Dr. Forte's figures for medical expenses and the report by the plaintiffs' vocational rehabilitation specialist, Peterson. Notably, he assumed that Mr. Thomas was totally, permanently vocationally disabled and would never be able to work again. He used statistics from the Centers for Disease Control and Prevention to determine that Mr. Thomas, who was 46.76 years old at the time of time of trial, had a life expectancy of 29.9 years. He then considered that medical expenses increase 1.5 to 2% per year more than other goods and services and used 1.5% in his calculations. He also applied a discount rate to reduce his figures to present value. He determined that, based on Mr. Thomas's life expectancy of 29.9 years, every $1,000 in future medical expenses would require an award of $34,977 for lifetime medical costs. Using Dr. Forte's medical expenses, Dr. Bettinger arrived at a median figure of $24,507 per year for those expenses, which included $5,448 per year for prescription medication. When this figure was multiplied by $34,977, Dr. Bettinger calculated that Mr. Thomas had future medical expenses totaling $857,181.
The plaintiffs cite Housley v. Cerise , 579 So.2d 973 (La. 1991), for the proposition that, where the plaintiff is in good health before the accident, and after the accident symptoms of an injury manifest themselves continually, and the medical evidence shows there is a reasonable possibility of a causal connection between the accident and the disabling condition, the burden of proof shifts to the defendant to demonstrate that some other accident or incident caused the injury. Mr. Thomas argues that he was in good health before the accident and has had pain from his injuries since the accident. He contends that the defendant failed to provide any evidence that he was not injured in the accident. He points out all his treating *327 physicians testified that, simply because his MRIs did not show nerve root compression, this does not mean that he was not injured and was not in pain. Mr. Thomas urges that, because the evidence showed that he would be in pain for the remainder of his life, the jury erred in failing to award future medical expenses in the amount set forth above.
Dr. Forte, who did not begin treating Mr. Thomas until 2014, and was still treating him at the time of trial, testified that Mr. Thomas had an injury caused by the accident and that his condition may get worse as he ages. The plaintiffs also rely upon testimony from Drs. Woods, Brown, and Oberlander, who stated that they did not think Mr. Thomas was malingering.
Several physicians, including Drs. Smith, Partington, and Forte, could not find any anatomical reason for Mr. Thomas's complaints and did not find any evidence of traumatic injury. In fact, the MRIs showed that Mr. Thomas's back and neck were in fairly good condition for his age. Some of the physicians agreed that, just because they could not see an anatomical reason for Mr. Thomas's pain, it did not mean that he was not, in fact, suffering from back pain. Several of these physicians, including Dr. Forte, to some extent, found that the problems with Mr. Thomas's back were age-related degeneration.
The jury recognized that Mr. Thomas was initially injured in the accident and made an award for past medical expenses. There was much conflicting evidence regarding whether he sustained lifelong injuries from this accident or whether he was malingering. The jury obviously questioned whether Mr. Thomas was permanently injured because his credibility was attacked repeatedly during the trial. Although Mr. Thomas had problems with his back after the accident, there was no objective anatomical reason for the pain he claims to experience now, several years after the accident. There was evidence in the record that any pain he may now have is attributable to the aging process. The jury made reasonable evaluations of credibility and reasonable evaluations of fact and determined that Mr. Thomas was not entitled to the damages he sought for future medical expenses for the rest of his life. In light of the great weight to be given to the factual conclusions of the trier of fact, we cannot say that its conclusion was clearly wrong or manifestly erroneous. We find that the jury's conclusion was a reasonable one, and we decline to reverse that decision.
LOST WAGES
The plaintiffs urge that the jury award of $34,977 for past lost wages was manifestly erroneous and that the jury erred in failing to make any award for future lost wages or loss of earning capacity. Mr. Thomas points out on appeal that the amount of the award, $34,977, was the multiplier that Dr. Bettinger, the plaintiffs' economist, used for each $1,000 of future medical expenses to arrive at the proper award for that item of damages.[16] According to Mr. Thomas, the fact that the jury used a figure that had nothing to do with past lost wages demonstrates its confusion and error. The plaintiffs also argue that the jury erred in failing to make any award for future lost wages or loss of earning capacity. This assignment of error has merit in part.
Legal Principles
To recover for actual wage loss, a plaintiff must prove that he would have been earning wages but for the accident in question.
*328 Boyette v. United Servs. Auto. Ass'n , 2000-1918 (La. 4/3/01), 783 So.2d 1276 ; Starr v. State ex rel. Dep't of Transp. & Dev. , 46,226 (La. App. 2 Cir. 6/17/11), 70 So.3d 128, writ denied , 2011-1835 (La. 10/21/11), 73 So.3d 386, and writ denied , 2011-1952 (La. 10/21/11), 73 So.3d 387, and writ denied , 2011-1625 (La. 10/21/11), 73 So.3d 388, and writ denied , 2012-2146 (La. 10/12/12), 98 So.3d 877 ; Woods v. Hall , 2015-1162 (La. App. 1 Cir. 4/20/16), 194 So.3d 689. A plaintiff seeking damages for past lost wages bears the burden of proving lost earnings, as well as the duration of time missed from work due to the accident. Boyette v. United Servs. Auto. Ass'n , supra .
Awards for past lost wages are not susceptible to the great discretion given the factfinder, because lost income is subject to mathematical calculation. Beasley v. Yokem Toyota , 33,805 (La. App. 2 Cir. 8/23/00), 767 So.2d 149. Although lost earnings need not be precisely proven, they must be shown with reasonable certainty. Lost earnings can be computed on the amount the plaintiff would in all probability have been earning at the time of trial. Starr v. State ex rel. Dep't of Transp. & Dev. , supra. See also Lewis v. State Farm Ins. Co. , 41,527 (La. App. 2 Cir. 12/27/06), 946 So.2d 708.
Awards for loss of future income are inherently speculative, and are intrinsically insusceptible of being calculated with mathematical certainty. Starr v. State ex rel. Dep't of Transp. & Dev. , supra ; Lewis v. State Farm Ins. Co. , supra . The loss of future wages encompasses the loss of a plaintiff's earning potential-the loss or reduction of a person's capability to do that for which he is equipped by nature, training and experience, and for which he may receive recompense. In determining a future loss of earning capacity award, factors to be considered are the plaintiff's physical condition before the injury, the plaintiff's past work history and work consistency, the amount the plaintiff would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life. Young v. Marsh , supra ; Collins v. ShelterMut. Ins. Co. , 36,528 (La. App. 2 Cir. 12/11/02), 833 So.2d 1166, writ denied , 2003-0124 (La. 3/21/03), 840 So.2d 539.
It is the plaintiff's burden of proving that his disability will cause him to suffer a lack of income. Beasley v. Yokem Toyota , supra . In many instances, lost earning capacity and future lost earnings are different elements of damages. Earning capacity is not necessarily determined by actual loss; damages may be assessed for what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. Higginbotham v. Ouachita Par. Police Jury , 513 So.2d 537 (La. App. 2 Cir. 1987).
The courts of appeal have a constitutional duty to review the law and facts. La. Const. Art. 5, § 10 (B); La. C.C. art. 1999 ; Ard v. Samedan Oil Corp. , 483 So.2d 925 (La. 1986) ; Beckham v. St. Paul Fire & Marine Ins. Co. , 614 So.2d 760 (La. App. 2 Cir. 1993). Once it is determined that the trier of fact is clearly wrong, the appellate court is empowered by La. C.C.P. art. 2164 to render any judgment which is just, legal and proper. Courts of appeal may award damages when the trial court initially rejects plaintiff's demands and where the record contains sufficient proof of damages. In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Instead, we set the award in an amount which is just compensation for the damages revealed by the record.
*329 Beckham v. St. Paul Fire & Marine Ins. Co. , supra ; Johnson v. CLD, Inc. , 50,094 (La. App. 2 Cir. 9/30/15), 179 So.3d 695.
Discussion
The jury found that Mr. Thomas was entitled to an award for past lost wages, but erroneously awarded an amount that related to future lost medical expenses and had no connection to the past lost wages claim. In calculating past lost wages, Dr. Bettinger used Mr. Thomas's actual 2008 wages of $30,982 and added 10.5% for fringe benefits, which included social security and a paid two-week vacation.[17] He applied a discount rate to bring the figure to 2015 dollars. This sum was $34,468.[18] According to Dr. Bettinger, Mr. Thomas's pre-accident earning capacity, expressed in 2015 dollars, was $18.72 per hour. He then determined that Mr. Thomas ceased working in February 2011, and had not worked again. Dr. Bettinger calculated past lost wages from February 2011 through the trial to be $169,981.
The defendants rigorously cross-examined Dr. Bettinger and questioned many of his assumptions. However, they failed to present testimony from another economist to dispute the discount rates, inflationary factors, or pre-accident earnings used by Dr. Bettinger in his calculations. The defendants argued that Mr. Thomas never earned $18.72 per hour and that he could have returned to work at some point, but refused to do so. The argument about the hourly wage fails to consider that this figure is not what Mr. Thomas actually earned, but is the 2015 equivalent of what Mr. Thomas was earning at the time he ceased working in 2011.
The record contains the results of the FCE by Dr. Green in early 2015, showing that Mr. Thomas can do light-duty work.[19] However, the jury obviously determined that Mr. Thomas was capable of returning to work long before the 2015 FCE. The jury may have intended to award Mr. Thomas past lost wages for one year and simply confused the figure given by Dr. Bettinger for one year of past lost wages, $34,468, with the figure he gave for the multiplier for future medical expenses, $34,977. This confusion was certainly understandable.
According to Dr. Bettinger, the amount that would compensate Mr. Thomas for one year of past lost wages is $34,468. This computes to $2,872.33 per month. Mr. Thomas stopped working in February 2011. The documentary evidence shows that Mr. Thomas was engaged in many activities beginning in early July 2012. (See footnote 7 above.) We find that Mr. Thomas should be awarded past lost wages from February 2011 until June 2012, a period of 16 months. Therefore, we award Mr. Thomas past lost wages in the amount of $45,957.
We must next consider whether the jury and the trial court erred in failing to make an award for future lost wages or loss of earning capacity. Mr. Thomas claimed he was entitled to an award for future lost wages and earning capacity in the amount of $734,476, as calculated by Dr. Bettinger. As set forth above, Dr. Green, who conducted the FCE, determined *330 that Mr. Thomas could do light-duty work. Peterson, the plaintiffs' vocational rehabilitation specialist, testified that Mr. Thomas could not work at all and was unemployable. Maatouk, the defendants' vocational rehabilitation specialist, determined that Mr. Thomas's abilities exceeded his academic test results and he could obtain employment as a short-order cook or could complete the requirements to become a phlebotomist. In addition to these conflicting opinions regarding Mr. Thomas's ability to work, the jury also heard some expert testimony that Mr. Thomas was malingering or exaggerating his symptoms. As repeatedly set forth above, the jury obviously had issues with Mr. Thomas's credibility.
Under all the circumstances presented here, the jury was reasonable in refusing to make an award of damages for future lost wages or loss of future earning capacity. There was evidence that, prior to trial, Mr. Thomas could do light-duty work, but that he was simply uninterested in ever returning to any type of work. He failed to show what future lost earning capacity, if any, would be if he found a light-duty job. Dr. Bettinger's calculations for future lost wages considered only the assumption that Mr. Thomas was not able to work at all. We do not find that the decision rejecting the claim for this element of damages was manifestly erroneous or clearly wrong. We reject the plaintiffs' argument to the contrary.
FAILURE TO MITIGATE DAMAGES
The plaintiffs argue that the jury erred in reducing Mr. Thomas's damage awards by 55% based upon a conclusion that he failed to mitigate his damages. The plaintiffs maintain that this finding is not supported by the evidence. This argument has merit.[20]
Legal Principles
Our jurisprudence recognizes that an injured party has a duty to take reasonable steps to mitigate his damages. Aisole v. Dean , 574 So.2d 1248 (La. 1991) ; Young v. Marsh , supra ; Lawrence v. City of Shreveport , 41,825 (La. App. 2 Cir. 1/31/07), 948 So.2d 1179, writ denied , 2007-0441 (La. 4/20/07), 954 So.2d 166. The victim is not required to make substantial expenditures or incur substantial risk to avoid the consequences of the defendant's conduct, but must use good sense, good faith, and fair dealing once the damage has been inflicted. Young v. Marsh , supra . The victim has an affirmative responsibility to make every effort to mitigate damages, but the care and diligence required is the same as that which would be used by a person of ordinary prudence under like circumstances. Lawrence v. City of Shreveport , supra ; Lake D'Arbonne Props., L.L.C. v. Digco Util. Const. , Inc. , 41,671 (La. App. 2 Cir. 1/31/07), 949 So.2d 590 ;
*331 Greenhead Gun Club, L.L.C. v. City of Shreveport , 40,045 (La. App. 2 Cir. 10/12/05), 914 So.2d 62 ; Sepulvado v. Turner , 37,912 (La. App. 2 Cir. 12/10/03), 862 So.2d 457.
An injured party is obligated to submit to reasonable medical treatment recommended for his improvement in order to minimize his damages. Flemings v. State , supra ; Barsavage v. State Through Dep't of Transp. & Dev. , 96-0688 (La. App. 1 Cir. 12/20/96), 686 So.2d 957, writ denied , 97-0595 (La. 4/18/97), 692 So.2d 455, and writ denied , 97-0634 (La. 4/18/97), 692 So.2d 456.
A plaintiff does not fail to mitigate damages simply by delaying to seek medical help when the delay is not unreasonable and did not aggravate the injury. McKnight v. McCastle , 2004-2437 (La. App. 1 Cir. 12/22/05), 928 So.2d 45, writ denied , 2006-0205 (La. 4/24/06), 926 So.2d 548 ; Fletcher v. Simmons , 37,758 (La. App. 2 Cir. 10/29/03), 859 So.2d 292.
Discussion
Regarding mitigation of damages, the jury was instructed:
The plaintiff has an affirmative duty to make every reasonable effort to mitigate his damages, but the care and diligence required of him is the same as that which would be used by a person of ordinary prudence under like circumstances. In order to minimize damage, an injured party is obligated to submit to reasonable medical treatment recommended for the party's improvement.[21]
The plaintiffs contend for the first time on appeal that the jury instructions on mitigation were incomplete and misleading because the jury was informed that, to minimize damages, an injured party is obligated to submit to reasonable medical treatment recommended for improvement. They complain that the jury was not told that the defendant had the burden of proving that the plaintiff acted unreasonably and that the unreasonable conduct aggravated the harm.
La. C.C.P. art. 1793(C) provides:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
See also Kose v. Cablevision of Shreveport , 32,855 (La. App. 2 Cir. 4/5/00), 755 So.2d 1039, writ denied , 764 So.2d 964 (La. 6/16/00), and writ denied , 2000-1289 (La. 6/16/00), 765 So.2d 340 ; Furlough v. Union Pac. R.R. Co. , 33,658 (La. App. 2 Cir. 8/31/00), 766 So.2d 751, writ denied , 2000-2929 (La. 1/12/01), 781 So.2d 556. The plaintiffs made no objection to the jury instruction regarding mitigation and cannot now complain that it was erroneous.
Regarding failure to mitigate, the defendants did show that Mr. Thomas failed to complete some physical therapy recommended by his doctors. Also, at some points he did not take all his medication. However, some of this was caused by difficulties in finding a treating physician to prescribe medications, which was attributable to LUBA. The delay in receiving some spinal injections was also due to LUBA, not by Mr. Thomas's failure to submit to treatment. Although, in accordance with La. C.E. art. 414, the jury was *332 not allowed to hear any reference to a workers' compensation claim, the jury was informed that the delay in receiving some of the injections was not attributable to any fault of Mr. Thomas.
The record fails to support a finding that Mr. Thomas failed to mitigate his damages by 55% with regard to medical treatment. Any failure was primarily caused by LUBA. Further, it does not appear to us from either the jury instructions or the jury verdict form that the jury understood or contemplated that the amounts it awarded for damages would be further reduced by 55%. Accordingly, we find that the jury was manifestly erroneous and clearly wrong in deciding that Mr. Thomas failed to mitigate his damages by 55%. We reverse the reduction made to the damage awards by the trial court in the judgment signed below.
LOSS OF CONSORTIUM
The plaintiffs maintain that the loss of consortium award of $10,000 to Mrs. Thomas was abusively low and should be raised to $35,000. This argument is without merit.
Legal Principles
La. C.C. art. 2315(B) authorizes the recovery of monetary damages for loss of consortium, service, and society by the spouse of an injured person. In general, a claim for loss of consortium has seven elements: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity. Damages for loss of consortium are general damages, the assessment of which the factfinder is given much discretion. Young v. Marsh , supra .
Discussion
Sharon Thomas testified that she had been married to Mr. Thomas for 19 years. They each had two children and they had a child together, who was a teenager at the time of trial. For the past six years, Mrs. Thomas had been employed as a nurse. She began working several jobs after the accident because Mr. Thomas was no longer earning the wages he had previously contributed to the family. She claimed he was in good health prior to the forklift accident and, since that time, has been in pain. She denied that he had high blood pressure or took medication for that condition prior to the accident. However, the record shows that Mr. Thomas began taking medication for high blood pressure in 2007. She also testified that Mr. Thomas had no difficulty "consummating the marriage" before the accident and denied that he saw a doctor on a regular basis before he was injured. The record shows that Mr. Thomas began taking medication for erectile dysfunction in 2005 and continued to have his prescription refilled.
According to Mrs. Thomas, during the time after the accident when Mr. Thomas tried to work, he would go to work, come home, and go to bed. He eventually began sleeping in a recliner and has done that for the past 4½ years. At that point, Mrs. Thomas said she and her husband became roommates instead of husband and wife. She claims he now drives only short distances and builds his weekly schedule around when he needs to take pain medication. Mrs. Thomas said that, after the accident, her husband became withdrawn, depressed, and contemplated suicide. She insisted that he begin participating in family activities or leave. She described the numerous trips the family took evidenced by the Facebook postings described above. According to Mrs. Thomas, Mr. Thomas no longer works or does the family yard work, *333 but he does try to mop, sweep, and do laundry.[22]
The record shows that, although Mr. Thomas ceased working in early 2011, and claims he slept in a recliner since that time, he was able to help with some duties around the house, such as sweeping, mopping, and doing laundry.[23] He had high blood pressure and erectile dysfunction for several years before the accident and was actively being treated for those conditions. In spite of his claims of severe back and neck pain, Mr. Thomas has been able to travel long distances in a vehicle on family trips and sit through numerous ballgames and events. Although the accident had some impact on the relationship between Mr. and Mrs. Thomas, that impact did not cause an extreme diminution in the quality of their relationship or their enjoyment of life together. We find that the jury award of $10,000 for loss of consortium was reasonable.
EXCLUSION OF EVIDENCE OF WORKERS' COMPENSATION CLAIM
The plaintiffs argue that the trial court erred in misapplying La. C.E. art. 414 to grant the defendants' motion in limine, to prohibit any mention of the workers' compensation claim. This argument is without merit.
Legal Principles
La. C.E. art. 414 provides:
Evidence of the nature and extent of a workers' compensation claim or of payment of past or future workers' compensation benefits shall not be admissible to a jury, directly or indirectly, in any civil proceeding with respect to a claim for damages relative to the same injury for which the workers' compensation benefits are claimed or paid. Such evidence shall be admissible and presented to the judge only.
Pursuant to this article, the legislature has evidenced its intention to impose a blanket prohibition upon the admissibility of information on the payment of workers' compensation cases in tort actions where the plaintiff is seeking damages relative to the same injury for which workers' compensation benefits were claimed or paid. Longman v. Allstate Ins. Co. , 93-0352 (La. App. 4 Cir. 3/29/94), 635 So.2d 343. It has been suggested that La. C.E. art. 414 should be interpreted to mean simply that the specified evidence concerning workers' compensation benefits is inadmissible if offered to minimize the plaintiff's claim by revealing that the plaintiff has already been compensated in part or to the extent of his prior compensation. Longman v. Allstate Ins. Co. , supra , citing Pugh, Force, Rault & Triche, Handbook on La. Evidence Law (1992). See also Legros v. Westlake Polymers Corp. , 97-579 (La. App. 3 Cir. 12/10/97), 704 So.2d 876, writ denied , 98-0095 (La. 3/13/98), 713 So.2d 472.
While the comments to La. C.E. art. 414 recognized that such evidence may be admissible for other purposes, for example, to attack the credibility of a witness, and discussed similar language contained in La. C.E. art. 413, dealing with settlement or tender, according to Longman , the comments opined that articles 413 and 414 should not be given such broad scope as to absolutely prohibit the introduction of such evidence. The Longman court found the comments suggested that such evidence *334 should be held to be admissible subject to the balancing test of La. C.E. art. 403, which provides "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." The Longman court disagreed with the comments.
The Longman court found that, where a statute is clear and unambiguous, the court must give credence to the mandate expressed by the legislature and cannot resort to construing a statute based on the spirit of the law, as opposed to the plain wording of the law. The court reasoned that, pursuant to La. C.E. art. 402, all relevant evidence in a case is admissible, except as otherwise provided by the Code of Evidence. According to Longman , the specific prohibition in La. C.E. art. 414 required the exclusion of all evidence of workers' compensation claims. Longman v. Allstate Ins. Co. , supra .
In Tolbird v. Wyble , 38,969 (La. App. 2 Cir. 12/15/04), 892 So.2d 103, writ denied , 2005-0444 (La. 4/29/05), 901 So.2d 1066, and writ denied , 2005-0449 (La. 4/29/05), 901 So.2d 1067, cert . denied , 546 U.S. 876, 126 S.Ct. 387, 163 L.Ed. 2d 172 (2005), this court found that allowing each party to use the payment or nonpayment of workers' compensation benefits to buttress their respective claims confused the jury as to a proper damage award in a tort case.
Discussion
Prior to trial, the defendants filed a motion in limine to exclude the introduction of any and all records, testimony and/or commentary related to the existence of workers' compensation benefits in this matter, citing La. C.E. art. 414. The defendants argued that the plaintiffs might suggest to the jury that LUBA's continued payment of indemnity and medical benefits would represent prima facie proof of an injury relating back to the accident. At the time the motion was filed, the appeal of the workers' compensation case was still pending before this court. The plaintiffs opposed the motion.
The motion in limine was heard on July 30, 2015, and was granted. On July 31, 2015, the plaintiffs filed a first supplemental and amended petition alleging that La. C.E. art. 414 is unconstitutional as applied to this case because it denied the plaintiffs the right to a fair trial, equal protection of the law, the right to fully and fairly confront adverse witnesses, and amounts to a denial of due process in violation of the Louisiana and United States Constitutions. The plaintiffs argued that, as applied, La. C.E. art. 414 severely restricted the right of the plaintiffs to confront and cross-examine adverse witnesses, particularly physicians, including, but not limited to, the physician hired by LUBA to conduct an insurance examination, and restricted the presentation of favorable evidence from coming before the trier of fact. They contended that the application of the article excluded evidence contradicting the claims of malingering and failure to mitigate damages alleged by the defendants.[24]
On appeal, the plaintiffs continue to urge that the application of La. C.E. art. 414, to exclude mention of the workers' compensation claim, prevented them from impeaching witnesses and negating the inference of failure to mitigate damages. They claim they should have been able to inform the jury that Dr. Smith was hired by LUBA and that some of the injections *335 were blocked by LUBA. According to the plaintiffs, La. C.E. art. 414 only prohibits disclosing to the jury the nature and extent of a workers' compensation claim, not the fact of its existence. The plaintiffs maintain that La. C.E. art. 414 is only aimed at preventing defendants from persuading a jury to diminish or eliminate claims for lost wages on the basis that the plaintiffs were compensated for those damages by virtue of the workers' compensation claim.
We find that the prohibition of presentation to a jury of evidence of a workers' compensation claim, contained in La. C.E. art. 414, is absolute, it was properly applied in this case, and the application of the article did not deny the plaintiffs a fair trial. At the argument of the motion in limine on this issue, the trial court found that La. C.E. art. 414 prohibited any mention of the workers' compensation claim. The attorneys were advised to instruct their witnesses not to mention it. At trial, the court itself instructed witnesses not to mention a workers' compensation claim in their testimony. The plaintiffs objected that they were not allowed to present to the jury that Dr. Smith was hired by LUBA. However, in questioning Dr. Smith, the plaintiffs were able to establish for the jury that he saw Mr. Thomas on referral from an insurance company. Regarding the delay in injections, the plaintiffs were able to establish that the delay in receiving the shots was not caused by any fault of Mr. Thomas.
In closing arguments, counsel for the plaintiffs again brought out that Dr. Smith examined Mr. Thomas for an insurance company. Also, in addressing the amount of damages to be awarded, plaintiffs' attorney said:
One thing you don't do is you don't assume, you know, he's absolutely got something so we can deduct that because anything he's gotten from a third party he's got to pay back.
The defense objected to this statement. Plaintiffs' counsel continued:
Don't deduct or he'll pay it twice. I've seen this happen before. I've seen it happen before with somebody trying to outguess the system and not follow the rules.
The defense declined to ask for a mistrial based upon this argument.
Regarding the defendants' argument that Mr. Thomas went for months without taking his medication, the plaintiffs' counsel told the jury that Mr. Thomas "had to fight every way to get bills paid, and sometimes had to go months without pain medication."
Even though the trial court correctly applied La. C.E. art. 414 to prohibit any mention of the workers' compensation case, the plaintiffs were allowed to show that they did not choose Dr. Smith to treat Mr. Thomas and were able to show that the delay in receiving shots and the difficulty in obtaining other medication was not attributable to any fault of Mr. Thomas. Further, plaintiffs' counsel came as close as possible in its closing argument to mentioning to the jury the existence of the workers' compensation claim. The trial court's application of La. C.E. art. 414 to this case was proper and did not deprive the plaintiffs of due process or a fair trial.
CONCLUSION
For the reasons stated above, we affirm those portions of the jury verdict and trial court judgment in favor of the plaintiffs, James and Sharon Thomas, awarding Mr. Thomas $40,000 in general damages, $40,000 for past medical expenses, and awarding Mrs. Thomas $10,000 for loss of consortium. We affirm the jury verdict and trial court judgment denying Mr. Thomas's *336 claims for future medical expenses, future lost wages, and loss of earning capacity. We affirm the ruling below that La. C.E. 414 applied to prohibit any mention to the jury of the workers' compensation claim by Mr. Thomas.
We find that the jury erred in its award for past lost wages. We amend that award and grant Mr. Thomas $45,957 for past lost wages.
We reverse that portion of the jury verdict finding that Mr. Thomas failed to mitigate his damages by 55%.
Costs in this court are assigned 1/2 to the plaintiffs, and 1/2 to the defendants, Bryan Boyd and Werner Enterprises, Inc. of Nebraska.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; AND AFFIRMED AS AMENDED.
APPLICATION FOR REHEARING
Before WILLIAMS, PITMAN, GARRETT, STONE and COX, JJ.
Rehearing denied.

Mr. Thomas was represented in both his workers' compensation case and the instant tort suit by the same law firm.

On August 4, 2015, the parties entered into an agreed order and stipulation specifying that LUBA's statutory lien under the Workers' Compensation Act was acknowledged and would be considered after the jury's verdict in posttrial hearings. LUBA was excused from appearing at the jury trial.

In December 2016, the parties entered into a stipulation that LUBA would not appeal the quantum award to the plaintiffs, reserving its rights against Mr. Thomas.

Prior to his job at Marsala, Mr. Thomas had worked as a short-order cook and took a course to become a phlebotomist, but did not become certified for the job because he could not complete the required number of arm sticks. He also had a candy-making business at one point that he operated out of his home. His testimony concerning his educational background was contrary to statements he made to doctors, as discussed below.

As noted below, his description of the accident has been inconsistent.

During the argument before the trial court on the motion for JNOV, plaintiffs' counsel appeared to concede that the evidence did not show that the carpal tunnel syndrome was related to the accident.

The jury was presented with evidence that the outings documented on Facebook included a trip to Orange Beach, Alabama, and Pensacola, Florida, and a waterpark in July 2012; a trip to San Antonio, Texas, including excursions to the Riverwalk, a boat ride, a visit to an animal park, and Six Flags Fiesta in August 2012; a football game in October 2012; a professional basketball game in January 2013; a trip to Hot Springs, Arkansas, and Magic Springs in August 2013; attendance at an event with a former high school coach in September 2013; a trip to Houston, Texas, for an NBA game at the Houston Toyota Center in March 2014; attendance at an awards day ceremony in April 2014; a trip to a children's museum and chocolate factory in Mississippi in April 2014; attendance at an athletic event and graduation ceremony in May 2014; a trip to New Orleans for a Beyoncé-Jay Z concert at the Mercedes-Benz Superdome in July 2014; attendance at weekly football games, both home and away games, during August, September, October, and November 2014; a trip to New Orleans for a Saints-49ers professional football game in November 2014; a trip to New Orleans, including a Pelicans professional basketball game at the New Orleans Arena, Bourbon Street, and Mulate's Restaurant in January 2015; attendance at various basketball games in the Monroe area in January, February, and March, 2015; a trip to Dallas, Texas, including the Dallas World Aquarium, an arcade, Tap & Tavern restaurant, and a professional basketball game in April 2015; attendance at a family reunion in Monroe, Louisiana, in July 2015. In addition to these trips and events, the record contained numerous pictures made at various restaurants.

In his testimony, Dr. Smith denied that he rollerbladed into the office or spent short amounts of time examining Mr. Thomas. Dr. Smith testified that he had been practicing neurosurgery since 1970. We observe that he had been practicing for approximately 40 years when he first saw Mr. Thomas and Mr. Thomas claimed the doctor rollerbladed into the office.

Immediately following the accident, Mr. Thomas went to Dr. Woods, who was the company doctor. Mr. Thomas's own primary care physician was Dr. Keith Calhoun, who treated him for erectile dysfunction in 2005. He was prescribed medication for this condition, which he continues to have refilled. Dr. Calhoun also began treating Mr. Thomas for high blood pressure in 2007. In addition, Mr. Thomas had sleep apnea and diabetes. In June 2011, Mr. Thomas saw Dr. Calhoun for the first time since the forklift accident and did not mention it. In July 2011, Mr. Thomas visited Dr. Calhoun, complaining of the gradual onset of numbness in his fingers.

The issue in that case was whether the workers' compensation judge ("WCJ") erred in reversing the decision of the Associate Medical Director ("AMD") for the Office of Workers' Compensation, denying any further injections for Mr. Thomas because they were not being done to facilitate active therapy. The AMD found the injections were for diagnostic purposes and should not be allowed. Based upon the evidence before this court at that time, we affirmed the WCJ who found the suggested injections were not only for diagnostic purposes, but for the relief of pain suffered by Mr. Thomas. The WCJ decided the issue solely on the information contained in the record, such as medical reports. The WCJ noted that prior injections had provided some relief. We found the WCJ was not manifestly erroneous or clearly wrong in that decision. We note that the 12-volume record presently before the court contains significantly more medical evidence, testimony, and exhibits than were available at the time Thomas v. Marsala Beverage Co. , supra , was decided.

Although Mr. Thomas was not able to complete this FCE, he later completed a FCE by Dr. Ernest Green, who determined that Mr. Thomas could perform light-duty work. Dr. Green's findings will be discussed below.

Dr. Richard Foster, an expert in radiology, examined MRIs ordered by Dr. Oberlander. He found that Mr. Thomas had mild degenerative disc disease with no evidence of acute trauma or traumatic injury.

The record is replete with examples of Mr. Thomas's complaints to doctors being inconsistent with his actual activities and demeanor as shown on his Facebook postings. An illustrative example is an entry in Dr. Forte's records on December 31, 2014, wherein Mr. Thomas reported that his pain interfered with the following daily functions:
General Activity Always Interferes Mood Always Interferes Walking Ability Frequently Interferes Normal Work Routine Always Interferes Relations with other People Always Interferes Sleep Always Interferes Enjoyment of Life Frequently Interferes Appetite Frequently Interferes
Shortly after this appointment, the Thomas family traveled from Monroe to New Orleans for the New Year holiday, where they attended a Pelicans professional basketball game at the New Orleans Arena, went to Bourbon Street, and dined at several restaurants. On a visit to Dr. Forte's office on January 28, 2015, Mr. Thomas reported similar levels of interference with daily activities.
In his January 18, 2015, interview with Dr. Green on the FCE, Mr. Thomas reported that he had "no social life." As will be discussed below, Mr. Thomas told Dr. E.H. Baker, a medical psychologist, that it was difficult for him to travel long distances and almost impossible for him to walk a block. Also, in relating how the accident transpired, Mr. Thomas told Dr. Baker that, after the accident, it took him a little while to "come to." Dr. Baker was not sure whether Mr. Thomas actually lost consciousness or was just badly shaken.

Mr. Thomas acknowledged that he had previously completed a course in phlebotomy at Northeast Louisiana University, and received a certificate, but did not complete the required number of arm sticks to be certified.

At trial, the parties stipulated that Mr. Thomas had past medical expenses of $79,288.73, but it was disputed whether all the charges were related to the forklift accident.

This argument was not urged below in connection with the motion for JNOV.

Although Mr. Thomas's wages fluctuated over the years, Dr. Bettinger used his highest year.

At several points in Dr. Bettinger's presentation, he used the figure $34,463. However, this appears to be an error.

This test was done in connection with the workers' compensation claim. The defendants could have requested that such a test be performed earlier. Because they did not, the only evidence before us is the 2015 FCE.

We note that no objection was made below to the jury charge or jury verdict form which asked the jury to quantify the amount of mitigation by a percentage figure. Although this appears rather unorthodox, both sides agreed to submit the issue to the jury in this manner. The jury then proceeded to find that Mr. Thomas failed to mitigate his damages by 55%. The defendants seem to contend that an analysis of mitigation is similar to an evaluation of victim fault. At oral argument, defense counsel cited Flemings v. State , 2007-1290 (La. App. 4 Cir. 8/26/09), 19 So.3d 1220, in support of including on the verdict form an interrogatory assigning a percentage to failure to mitigate damages. We do not find that Flemings is sufficient support for that contention and we express no opinion on the wisdom of such an approach. We also note that, prior to trial, the plaintiffs obtained a partial summary judgment on the issue of fault. The defendants were determined to be 100% at fault so there was no comparative fault issue in this case.

We note the jury instruction was limited to submission to medical treatment. Although the defendants argued, both below and before us, that Mr. Thomas failed to work, although capable of doing so, this was not covered by the instructions given to the jury.

Mrs. Thomas admitted that she filed for bankruptcy in 2009, and had not been released when this accident occurred. She did not report her claim for consortium to the bankruptcy court.

The record is unclear where Mr. Thomas slept on the numerous out-of-town trips described in footnote seven above.

It does not appear that the plaintiffs ever requested a ruling on this supplemental argument.