Judgment rendered November 17, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,162-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

Dettenhaim Farms, Inc.                              Plaintiff-Appellee

versus

Greenpoint Ag, LLC, Nationwide                      Defendant-Appellant
Mutual Insurance Company,
Wesley Emmett Sanchez, and ABC
Insurance Company

* * * * *

Appealed from the
Sixth Judicial District Court for the
Parish of East Carroll, Louisiana
Trial Court No. 22,651

Honorable Michael E. Lancaster, Judge

* * * * *

COOK, YANCEY, KING & GALLOWAY
By: Brian Allen Homza                               Counsel for Appellants
Elizabeth Mendell Carmody
Luke D. Whetstone

HALES & STRICKLAND                                  Counsel for Appellees
By: Myrt T. Hales, Jr.
Joshua Strickland

* * * * *

Before PITMAN, THOMPSON and ROBINSON, JJ.

**ROBINSON, J.**

In this lawsuit alleging damages to a soybean crop caused by the failure of a salesman of crop supplies to timely notify two farmers that he was no longer checking their soybean crop for insects, the defendants appeal a judgment awarding $246,334 in damages for lost profits.

We amend the judgment to reduce the damage award and to dismiss two of the parties plaintiff, and affirm the amended judgment.

## BACKGROUND

Robert Nathan Dettenhaim ("Bobby") and his son, Robert Jason Dettenhaim ("Jason"), together farm 800 acres located in East Carroll Parish and West Carroll Parish. The land is owned by Jason's parents. Jason is the president, sole owner, and sole board member of Dettenhaim Farms, Inc. ("DFI"). DFI never farmed crops before 2018, and it owns no cropland.

Wesley Sanchez is a longtime close friend of the Dettenhaims. Sanchez worked as an outside salesmen for various sellers of farm chemicals. Since the 1990s, Bobby and Jason had purchased most of their farm chemicals through Sanchez. Greenpoint Ag, LLC became Sanchez's employer around 2011. He was based out of Greenpoint's store in Mer Rouge, Louisiana.

The process of preparing for the planting of the soybean crop was the same each crop year. Bobby and Jason would book their seeds in December. A chemical burndown of the fields was conducted early in the next year. Sanchez would check the fields before the burndown to see what weeds needed to be destroyed. Sanchez would check the fields again after the burndown. Several weeks after planting the seeds, Bobby and Jason would spray a herbicide to destroy any weeds and vines. During the summer,

Sanchez would check their crops for stinkbugs. Once the stinkbugs reached a certain threshold, he would recommend an insecticide to be applied. Sanchez was Bobby and Jason's "bug man."

Sanchez had about 12 customers in 2016, and only three of those customers employed independent crop consultants. The Dettenhaims were not one of those three. They completely relied on Sanchez to check their crops and make recommendations about what and when to spray. Sanchez would often check their fields without being called and on his own schedule. Their professional relationship was a bountiful one until 2016.

### The 2016 growing season

Going into the 2016 season, the Dettenhaims had a carryover balance of around $45,000 with Greenpoint. They were required to pay cash for products because they lacked credit. On March 14, they paid an outstanding balance of $134,000 owed to John Deere Financial ("JDF"). Bobby and Jason promptly applied for credit with JDF.

Leela "Sue" Rainbolt-Tatum is an administrative assistant at Greenpoint's Mer Rouge location. On April 6, she received a hand ticket reflecting the purchase of $10,098 in chemicals by the Dettenhaims. She settled that ticket on the same date to their JDF line of credit.

On April 11, Sanchez handed Rainbolt-Tatum a check for $10,098 from the Dettenhaims and asked her to apply it to their cash account or a prepay account. She did not remember the hand ticket from five days earlier due to the volume of hand tickets that she had processed during that period. She told Sanchez that because the Dettenhaims did not have a cash account, the only option was to apply it to the carryover balance on their credit account or return it. She attempted to apply the check to the Dettenhaims'

2

credit account, but the check was canceled a week later. The JDF credit was exhausted during the burndown. Marestail weed returned following the burndown, but Sanchez made it right by arranging for another herbicide.

Jason spoke with Keith Aymond, Greenpoint's credit manager, on April 7 concerning the carryover balance and told Aymond that he planned to sell several houses and some of his cattle. Aymond, who was based in south Louisiana, told Jason that the account would go to collections if not paid by June 15.

Between May 8 and May 12, Bobby and Jason planted their soybean crop on 698.87 acres covering farm numbers 281 and 1736 in East Carroll Parish. On May 10, they planted their soybean crop on 100.84 acres covering farm number 4646 in West Carroll Parish.

Benny Guerrero, Greenpoint's location manager in Mer Rouge, claimed that during a June 9 phone conversation, he told Bobby that the Dettenhaims' past-due balance had caused a lot of anxiety, they were driving Sanchez crazy, and he thought it was best that they find a new supplier. Loftin Madden, the warehouse manager at the Mer Rouge location, stood in the doorway of Guerrero's office during the call and heard Guerrero's side of the conversation.

Later that month, Benny related to Sanchez that he had told the Dettenhaims that they probably needed to find somewhere else to do business. He told Sanchez that he might not need to go back to the Dettenhaims' fields and to spend his time more wisely.[1] Sanchez never communicated this to his friends and loyal customers Bobby and Jason. In

---

[1] Around that same time, Guerrero told other employees at the Mer Rouge location not to provide services to the Dettenhaims.

fact, nobody associated with Greenpoint did. Guerrero thought his phone conversation with Bobby was very direct and Bobby knew what he meant, so there was no need to specifically tell Bobby and Jason that Sanchez was no longer going to their farm. Sanchez knew that the Dettenhaims did not have a crop consultant. However, he thought what Benny had told them was sufficient.

Aymond texted Jason on June 29 about the outstanding balance. Jason told him that he could pay only $5,000 at the moment. Aymond told him that was perfect and to bring the check to the Mer Rouge location. Jason's secretary delivered the $5,000 check as instructed.

A cash account was opened for Bobby and Jason at Greenpoint in June. This allowed them to buy products from Greenpoint by either producing a check or paying at the time the product was picked up or delivered. At the end of June, the Dettenhaims purchased Gramoxone and a 30-gallon drum of Roundup from Greenpoint. Although there was some confusion involving the matter, the $5,000 check was apparently applied to this purchase and the remainder was applied to the carryover balance.

Jason spoke to Sanchez on July 20 and found him to be in a good mood. Jason related that Aymond contacted him on August 1 and accused him of not submitting the $5,000 check as promised. On that date, a letter was sent from Greenpoint to the Dettenhaims reminding them of the past-due balance.

Jason texted Sanchez on August 10 because he realized that he had not heard from Sanchez for some time. Sanchez told Jason that he needed to call his consultant. Jason then spoke with a neighboring farmer, David Elliott, about whether he had been spraying his fields.

4

On August 24, Bobby asked a friend, Mark Tackett, to look at his soybean fields. Tackett and Justin Densmore, a salesman at Crop Productions Services, came the next day. They only looked at fields in East Carroll Parish. The damage that they observed was from worms and stinkbugs. They recommended that the fields be sprayed because the stinkbugs were at threshold levels. The recommended insecticide was picked up by the Dettenhaims on August 30.

In either September or October, Sanchez took photographs of the soybeans in one of the Dettenhaims' East Carroll Parish fields from the road. This was prior to the harvest. He also retrieved some stalks along the edge of the field. He thought the stalks looked damaged from stinkbugs and worms.

The Dettenhaims were able to harvest some of their soybean crop and sell the beans. On March 1, 2017, Bobby, in his individual capacity, and Jason, individually and as president of DFI, executed a promissory note for over $57,000 in favor of Greenpoint. No payments were ever made on this note.

*Lawsuit*

On December 14, 2016, DFI filed suit against Greenpoint, its insurer, Nationwide Mutual Insurance Company, and Sanchez. DFI asserted that for 20 years it had relied on Sanchez to check for insects and weeds and to recommend treatment. DFI further asserted that this reliance was to its detriment because in early August of 2016, it learned that Sanchez had not checked their soybean crop, and by then, stinkbugs had already caused major damage to the crop which drastically reduced the 2016 yield. DFI further alleged that it could have found another crop consultant if Sanchez and

5

Greenpoint had given timely notice that he would stop consulting for the Dettenhaims.

On August 8, 2017, DFI amended its petition to add Bobby and Jason as plaintiffs in their individual capacities and as owner and manager of DFI. Jason and Robert alleged that they suffered damages through the reduction in soybean yield and having to prematurely sell their herd of cattle in order to compensate for the crop loss. They further alleged that they suffered mental anguish because of defendants' actions.

On April 10, 2018, Greenpoint filed a reconventional demand in which it alleged that DFI, Jason, and Bobby owed payment on the promissory note executed on March 1, 2017. Greenpoint alleged the note had matured and was due in full. The plaintiffs answered that any amount owed as claimed by Greenpoint was caused by Greenpoint's own negligence and Greenpoint should be estopped from seeking payment.

*Trial*

A bench trial was held over four days in July of 2019. Among the witnesses at trial were Bobby and Jason; their spouses; their employee James Corley; numerous Greenpoint employees including Sanchez, Guerrero, and Aymond; and Densmore.

A plethora of documents including financial records, telephone records, crop reports, sales tickets, and the deposition of plaintiffs' CPA were filed into evidence. The photographs of the crops taken by Jason in July, September, and October were also filed into evidence.

Reynold Minsky testified as an expert in agricultural consulting. He examined three of the Dettenhaims' fields in East Carroll Parish on

6

September 15 as a favor to Bobby. Cecil Jones accompanied Minsky because Jones had sold the type of seed used by Bobby and Jason.

Minsky estimated that the soybeans in the first field that he examined had 10-20% damage from mostly stinkbugs. The stinkbug and worm damage that he found in a second field was considered by him to be quite severe. He reached his damage estimate by counting the good pods and the bad pods on a plant, and then looking at the damage in the bad pods. He thought the third field had the worst damage from stinkbugs and worms, but he did not provide an estimate because he did not take counts from the stalks.

Minsky explained that he did not conduct a commercial count or net sweep because he did not realize that he had been asked to look at the fields to quantify the amount of damage. Nevertheless, he stood by his calculations. He also explained that a person cannot tell whether damage was caused by stinkbugs merely by pulling the pod and examining it. Instead, the pod has to be opened.

Minsky also inquired about the soybean yield from a couple of surrounding farms. Based upon that information as well as his own observations and 66 years of experience, he estimated that Bobby's and Jason's yield would have been 65-70 bushels per acre in one field, and 75-80 bushels per acre in the second field.

Minsky conceded that he would have been more meticulous in his approach if he had been asked to estimate a crop yield on behalf of a bank or an insurance company. He did not go out to the fields to make an estimate. Nevertheless, he thought the estimate that he provided was an educated

guess of what he saw, and it was a fair and comparable estimate of what was being done in that area of East Carroll Parish in 2016.

David Elliott is a "farm neighbor" of Bobby and Jason. Elliott farms 1600 acres in East Carroll Parish and 200 acres in West Carroll Parish with his brother under the name of Elliott Brothers Partnership. They have two farms in East Carroll Parish, numbers 405 and 3492, which are near the Dettenhaims' farms in that parish. Elliott drew a map which was introduced into evidence. The map indicates that farm 3492 borders the Dettenhaims' fields in some places, while in other places only a road or woods separate them. Elliott does not farm next to the Dettenhaims in West Carroll Parish.

Carlton Clark testified as an expert certified public accountant with specialties in economic damages, lost profits, and business valuation. He explained that he was asked to compute the lost profit damages from the 2016 soybean crop and the cattle sales.

Clark offered three alternatives for estimating the crop loss suffered by Bobby and Jason. The first alternative looked at their average yields from 2011-2015 to determine the yield assumption. The lost profit damage under this alternative was $91,795. The second alternative looked at their best yield during those five years, which was 2014, to determine the yield assumption. The lost profit damage under this alternative was $148,946. The third alternative looked to the 2016 yield of Elliott's farm to determine the yield assumption. The lost profit damage under this alternative was $246,334.

Edward Peters is an independent crop consultant who testified on behalf of defendants as an expert in crop consulting, entomology, weed science, and plant pathology. He has 23 clients with fields all over northeast

8

Louisiana, and he explained that July is a very busy time of the year for him. He charges a per-acre fee, and he gives his clients regular reports when he begins his scheduled rounds. He relies on his farmers to let him know it is time to check their beans. He usually visits the same fields on the same day each week, and tries to provide a report after each visit even if there is not anything for him to do.

Peters was retained by defendants in the fall of 2018. He never visited the Dettenhaims' fields. He testified that if he had done a calculation of the damages, he would have taken a certain number of sample sizes from more than one site in each field. He would look at one set of samples and probably take the other set to someone more qualified to rate damage. Peters considered it important to visit each field since there can be a lot of variation from one field to the next.

Peters agreed that red-banded stinkbugs were very bad in 2016. Some of his clients sprayed two and three times and they still had stinkbugs in their fields as well as damage. Peters also believed that there was an abnormally high amount of rainfall in July and August of 2016.

Peters thought the ranges of damages determined by Minsky were large. He maintained that Minsky did not conduct a lot of sample collecting, analysis, and quantitative counts. In summary, he did not think that Minsky relied on any hard data. Peters opined that one cannot look at a few stalks in one or two fields and apply that to 800 acres. In Peters' experience, taller stalks do not always produce greater yields than shorter stalks. He also thought that due to the Dettenhaims' delay in getting someone to look at the crop and then spray, it was very likely that what Minsky saw on September

9

15 was different than what they saw on August 10. It was more time for new stinkbugs to start feeding again.

***Reasons for judgment***

The trial court concluded that the plaintiffs relied on Greenpoint and Sanchez to advise them concerning what products to use on their fields and when to apply them, that the reliance was justified, and this reliance led to a change in their position to their detriment. The court noted: (1) Sanchez checked their crops for insects from 1995 until 2016; (2) the Dettenhaims justifiably relied on Sanchez's services for at least 25 years; (3) at least 9 of Sanchez's 13 customers did not hire independent paid crop consultants and relied on him for advice; (4) Sanchez did not check the Dettenhaims' crops for stinkbugs after they clearly relied on him to do so; and (5) the damage had already been done once they discovered on August 10 that Sanchez was not going to check for stinkbugs because the first wave had passed.

The trial court did not agree with Greenpoint's argument that detrimental reliance was not applicable because the Dettenhaims were in debt for more than $50,000 to Greenpoint going into the 2016 crop year, Guerrero told Jason during the summer that they needed to find another product supplier because of their debt, and Sanchez told them on August 10 that they needed to contact their crop consultant. The court noted that the Dettenhaims' carryover debt in 2008 did not result in Greenpoint prohibiting Sanchez from scouting their fields or to advise, recommend, and sell products to them. The court also noted that Greenpoint had misapplied a $5,000 payment made at the request of Aymond to keep their account from going into collection. Finally, the court noted that Guerrero never said during the alleged phone call on June 9 that Sanchez would no longer be

10

allowed to scout their property or sell products to them. Greenpoint continued to sell products to them after that date.

Utilizing a duty/risk analysis, the trial court found that defendants owed a duty to the Dettenhaims and failed to conform to that duty, and the failure to inspect the crops led to the Dettenhaims' failure to spray in a timely manner, which then allowed the primary round of stinkbugs to damage their crop.

The court recognized that Jason, Bobby, Minsky, Corley, Sanchez, and Densmore all related the crop damage to insect infestation. The court also recognized that the damage would not have occurred if Sanchez had inspected the crops. Thus, causation was established by a preponderance of the evidence.

Regarding damages, the court addressed the defendants' argument that DFI's claims should be dismissed because it did not own the land or have an interest in the 2016 soybean crop. The court noted that business was conducted with Greenpoint in the name of DFI and Dettenhaim Farms, which was an unincorporated association owned by Bobby and Jason. The plaintiffs would provide their information to their CPA, who would then allocate income and expenses among DFI, Bobby, and Jason. The court recognized this practice was common in the farming industry and decided to "lump the damages among all of the legal entities and individuals and let their tax expert allocate those damages as he [saw] fit."

The trial court accepted Clark's third method of calculating damages, which looked to the yield of Elliott's nearby farms and concluded the lost profits were $246,334. The court acknowledged that although the farming practices differed among their neighbors, the yield on the Dettenhaims' acres

11

was comparable to those of their neighbors. The court did not accept the defendants' argument that the plaintiffs failed to mitigate damages by waiting at least two weeks to spray for stinkbugs after identifying the cause of the damage. The crop damage had already been done on August 10. The second wave of bugs arrived two weeks later and the plaintiffs mitigated those damages by spraying later.

The trial court rejected the plaintiffs' demand that they were forced to sell 600 head of cattle to pay down debt because of the damage to their soybean crop. The court also rejected their demand for mental anguish damages as their emotional distress did not rise to the level of the psychic trauma exception to the general rule against permitting damages for emotional distress caused by damage to one's own property. Finally, the court found in favor of Greenpoint on its reconventional demand regarding the promissory note.

Judgment was rendered on June 3, 2020. Defendants (collectively referred to as "Greenpoint") filed a suspensive appeal.

**DISCUSSION**

Greenpoint argues on appeal that the trial court erred in: (i) awarding damages to DFI and Jason when there was no evidence that they had a real or actual interest in the unharvested soybean crops; (ii) finding that plaintiffs established by a preponderance of the evidence that Greenpoint caused damage to the unharvested soybean crops; (iii) failing to find that Bobby and Jason did not mitigate their damages; and (iv) in awarding damages based on Clark's third alternative calculation.

12

*Causation*

Greenpoint argues there is no factual basis in the record supporting the trial court's finding that Bobby and Jason established by a preponderance of the evidence that Sanchez and Greenpoint caused damage to the unharvested soybean crops.

An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Cole v. State Dept. of Public Safety & Corr.*, 01-2123 (La. 9/4/02), 825 So. 2d 1134; *Stobart v. State through Dept. of Transp. & Dev.*, 617 So. 2d 880 (La. 1993).

To reverse a factfinder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. *Stobart*, *supra*. Even if an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Cole*, *supra*; *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989). Moreover, where the factfinder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Rosell*, *supra*.

Greenpoint contends that the August 10 text unambiguously put Bobby and Jason on notice that Sanchez was not checking their crops, and

there was no evidence to show the crops were actually damaged on August 10 other than the self-serving testimony of Bobby and Jason, who admitted that they were not bug experts. Greenpoint notes that Corley never said exactly when he saw the damage that he observed. Greenpoint also notes that Minsky did not look at the fields until September 15, and he specifically stated that he could not tell whether the damage was done earlier. Densmore did not look at the fields until August 25.

Plaintiffs counter that but for the conduct of Greenpoint's employees, the damage would not have occurred.

Jason testified that his father checked the fields once they realized that Sanchez had not, and that his father did not find anything. Jason acknowledged that they were not bug experts. Bobby thought the fields looked all right on August 10 and he only saw a few stinkbugs. He believed that the stinkbugs had already come through without him noticing.

Jason testified that he and his father found little brown dingy spots on stalks that they pulled. Greenpoint notes there was no evidence linking the brown dingy spots to insect damage, showing exactly which fields had issues, or showing what percentage of the crops had these spots.

Greenpoint is dismissive of the photos of the fields taken by Jason. Greenpoint argues that the photos are irrelevant because not a single photo shows what the beans looked like on August 10.

Bobby testified that Tackett showed him a lot of small stinkbugs on August 25 by turning over leaves. Bobby did not even know those bugs were there until Tackett and Densmore showed him. Bobby was under the impression that the adult stinkbugs had laid their eggs and then left. Jason recalled that the little stinkbugs found by Tackett and Densmore were not

14

significant enough to meet the spraying threshold. Bobby testified that they followed Tackett's recommendation to spray and it wiped out the bugs.

David Elliott testified that he had to spray for stinkbugs three times in 2016 as it was an extremely bad bug year, especially for stinkbugs. Elliott also testified that he told Bobby that he had sprayed because he had told Bobby that he would let him know when he sprayed. He recalled that Bobby asked why he was spraying, and he told Bobby that it was for bugs. He asked Bobby if he had any bugs because he had already sprayed twice and his own bug man was asking to spray a third time, and Bobby said he did not have any bugs. Elliott also testified that Bobby told him that Sanchez was not checking his crops, so he told Bobby that he would let him know whenever they sprayed.

Jason testified that after Sanchez texted him with the bad news on August 10, he asked Elliott if he was already spraying. It's reasonable to conclude that Elliott had already commenced his aggressive spraying regimen on or around August 10. This was an indication that stinkbugs were at threshold levels in the area and that farmers should have been vigilant of their presence. Bobby and Jason were basically blindsided on August 10 when they learned that Sanchez had not been checking their crops. It is absurd to suggest that stinkbugs suddenly materialized and caused their damage to Bobby and Jason's crop only after August 10. The trial court's finding that plaintiffs established by a preponderance of the evidence that Greenpoint caused damage to the unharvested soybean crops was not clearly wrong.

Greenpoint also argues there was no evidence of damage at all in the West Carroll Parish fields. Greenpoint notes that Densmore and Minsky never looked at those fields. Elliott testified that having certain damage to his East Carroll Parish crops would not necessarily mean that he would have damage to his West Carroll Parish crops.

Jason testified that he checked for damage many times in the East Carroll and West Carroll fields. He stated that all of the fields, including the two fields in West Carroll Parish, were damaged by stinkbugs, with most of the fields having a lot of damage.

Bobby testified that the fields in West Carroll were two to three miles away from the fields in East Carroll Parish. Bobby also testified that the soybean fields in West Carroll Parish were damaged, with one field being really bad and the other field just bad. According to Bobby, 100% of their soybean fields were damaged in 2016. Greenpoint's argument regarding the fields in West Carroll Parish is without merit.

*Damages*

Greenpoint argues that the trial court committed legal error by failing to apply the proper legal standard when calculating damages. Greenpoint claims that the method chosen by the court, Clark's third alternative which relied on the 2016 yield from Elliott Brothers' farm, was not in accord with the legal standard found in *Aultman v. Rinicker*, 416 So. 2d 641, 644 (La. App. 2 Cir. 1982), which is:

> Generally, the amount of damages which should be awarded for the loss of a growing crop is the average yield and market value of crops of the same kind, planted and cared for in the same manner and in the same area, less the cost of cultivating, harvesting, and marketing the crop.

It is well settled that reviewing courts afford great discretion to a factfinder's determination of both general and special damages. *Baack v. McIntosh*, 20-01054 (La. 6/30/21), __ So. 3d __, 2021 WL 2679825; *Guillory v. Lee*, 09-0075 (La. 6/26/09), 16 So. 3d 1104.

Greenpoint maintains that the third alternative offered by Clark was inapplicable because the trial court failed to determine that Elliott's 2016 crop was planted and cared for in the same manner as the Dettenhaims' crop. Moreover, the trial court specifically found that farming practices differed among their neighbors. Thus, Greenpoint argues that the court found that farming practices were not conducted in the same manner but then awarded damages based upon a neighbor's crop yields.

Plaintiffs counter that Clark was the only accounting expert who testified at trial. They note that Minsky testified about an expected yield based on other yields from the area and from looking at their crop. Finally, Bobby, Jason, and Corley testified that this was their best crop ever.

There were similarities between Elliott's farms 405 and 3492 and the Dettenhaims' fields in East Carroll Parish. The soil on their farms was Sharkey clay, and their farms were irrigated. However, there were also some notable differences. Elliott had a paid crop consultant who provided weekly reports. He used a different variety of seed. He also planted in twin row crops, while the Dettenhaims planted in a single row. Elliott also planted several weeks earlier in 2016.

Greenpoint's expert, Peters, testified that seed variety, planting depth, plant spacing, row spacing, row configuration, planting date, and use of fertilizer, herbicide, insecticide, and fungicide can all affect a soybean yield. He explained that planting earlier is preferred, and that most of the time

17

soybean farmers want to plant within the first two weeks of April. He added that a farmer will usually have to deal with more pests the later in the season the farmer plants.

Peters pointed to a study in Mississippi that showed a 0.4 bushel per day decrease for each day planted after April 10. He noted that Elliott planted on April 14 or 15, while the Dettenhaims planted the following month.

Minsky testified that multiple factors can affect yield, and these factors include soil sampling, soil types, weather, irrigation practices, seed types, tillage practices, planting dates, and weed control.

Clark relied on the methodology presented in a publication by Robert L. Dunn titled *Recovery of Damages for Lost Profits*. He testified that he used Elliott's yields because he thought it was a relevant comparable. However, that comparable is not consistent with the standard used in *Aultman*.

Clark stated that he took into account that both farms had the same soil type and were irrigated. However, he did not take into account their different planting dates, seed grouping, seed varieties, insecticide and herbicide applications, and soil pH levels.

Based on our review of this record, we conclude that the trial court abused its discretion when it chose Clark's third alternative.

We recognize that the use of alternative two is supported by the record and is not overly speculative. This alternative used the Dettenhaims' highest historical yields in East Carroll and in West Carroll. Clark testified that he used the highest yield during that five-year period, which was from 2014,

because Bobby had testified the 2016 crop was going to be the best soybean crop that he had ever harvested.

Minsky testified that they had great yields in East Carroll Parish in 2016, and that 2016 was a good year for beans. Corley testified that the 2016 crop was the best soybean crop they had ever had based on a pod count. Jason testified that soybeans consistently made it to the top of the stalk across all of their fields in 2016. Jason related that it is usually hard for soybeans to make it all the way to the top of the plant.

Accordingly, utilizing Clark's second alternative measure of damages, we reduce the damage award to $148,946.

*Mitigation*

An injured party has a duty to take reasonable steps to mitigate his damages. *Thomas v. Boyd*, 51,621 (La. App. 2 Cir. 11/15/17), 245 So. 3d 308, *writs denied*, 18-0232 (La. 4/16/18), 239 So. 3d 832, 18-00233 (La. 4/16/18), 240 So. 3d 923. The victim has an affirmative responsibility to make every effort to mitigate damages, but the care and diligence required is the same as that which would be used by a person of ordinary prudence under like circumstances. *Id*.

Greenpoint maintains the trial court committed manifest error in not finding that plaintiffs failed to mitigate damages. The trial court concluded that the crop damage had already been done and there were few bugs left in the field by August 10, and that plaintiffs mitigated their damages by spraying the field when the second wave of bugs arrived a couple of weeks later. Greenpoint contends there is nothing in the record to support this finding.

Greenpoint argues that plaintiffs failed to mitigate their damages by not acting with any urgency as they unreasonably delayed by three weeks any attempts to salvage the crop after Sanchez notified them on August 10 that they needed to find a crop consultant. According to Greenpoint, Bobby and Jason did nothing of significance when Elliott told them on August 10 that he had been spraying for bugs. They checked the crops despite admitting they were not experts, then they waited 14 days before calling someone to look at the crops. Tackett and Densmore came the following day, August 25. Next, they waited another five days until August 30 to pick up the recommended products. Greenpoint argues that these delays were unreasonable.

Greenpoint further contends that plaintiffs "feigned blindness" to Sanchez not scouting their fields after March. Greenpoint submits that Bobby and Jason refused to take responsibility for monitoring their crops and following up with Sanchez. They knew farmers generally spray pesticides in July or August, yet Jason waited until August 10 to text Sanchez.

Plaintiffs counter that not only did they contact multiple crop consultant for advice on what to do, they also made a pesticide application when told to do so and did their best to harvest the crop even after being told that a harvest was probably not a good idea.

Jason testified that he was not concerned after speaking with David Elliott on August 10 because they had planted several weeks after Elliott did. Jason figured that he still had 7 to 10 days to spray since Elliott had sprayed on August 4 or 5. Jason never spoke with any other neighbors.

20

Bobby testified that everything looked all right to him on August 10 and he saw only a few stinkbugs. He knew they normally sprayed in August and he expected to spray a couple of weeks later since they had planted later than others. He did not think it was necessary to call Tackett around August 10 because he did not see many stinkbugs when he had looked.

Jason did not have anyone in mind to contact about the crops after receiving Sanchez's text. Jason also explained that it is difficult to find a crop consultant in the middle of the season. Bobby also claimed that it would be difficult to get someone in the middle of the season as a consultant would not want to go behind someone else. However, we note that his friend Tackett came the day after he was called. In addition, Minsky testified that he would have looked at the fields on August 10 if he had been contacted.

We find merit to Greenpoint's argument on this issue. Time remained of the essence after August 10 even though the first wave of stinkbugs had already passed.

Densmore thought the damage was already done when he went to the East Carroll Parish fields on August 25. However, he also testified that the stinkbugs were at threshold levels on August 25 in the fields they checked, and they recommended that Bobby and Jason spray. Densmore believed that the stinkbugs continued to do damage during the five days between the date he visited the fields and when the recommended pesticide was obtained by Bobby and Jason on August 30.

Although Minsky conceded it was purely speculation by him since he was not contacted in August, he agreed that it would have made somewhat

of a difference to the condition of the crop that he saw on September 15 if someone had sprayed on August 10 or August 24.

Guerrero, who is a licensed crop consultant, testified that spraying for red-banded stinkbugs needs to be done quickly once they reach the threshold level and every day is important. He added that just because a neighbor is spraying does not automatically mean that others need to spray, but there is a good chance that you should be spraying under those circumstances. Guerrero added that time is also critical because of the time it takes for the process of acquiring the product and then arranging for the actual spraying of it by a plane.

Peters testified that stinkbugs are always there, moving in and out, and laying eggs. He explained that damage very likely occurred between August 10 and when the Dettenhaims called someone on August 24. He added that the damage increased between August 24 and when they obtained the pesticide and sprayed it.

Based upon our review of the record, we conclude that the trial court was clearly wrong in not finding that Bobby and Jason failed to mitigate the damages. We further conclude that had they taken reasonable action and obtained advice sooner from Tackett or Minsky and acted on that advice, the damages they sustained would have been reduced by 10%. Accordingly, we reduce the damage award to $134,051.

*Ownership*

Greenpoint contends that Jason and DFI have no right of action for the property damage claims because they lacked a real or actual interest in the unharvested soybeans. Greenpoint further contends that the trial court

22

neglected to address its contention that plaintiffs failed to establish that DFI or Jason had an ownership interest in the unharvested soybean crops.

An action can be brought only by a person having a real and actual interest which he asserts. La. C.C.P. art. 681. The exception of no right of action may be noticed by an appellate court. La. C.C.P. art. 927(B).

Greenpoint asserts that Bobby provided the only evidence at trial concerning the ownership of the land in both parishes on which the soybean crops were grown. There was no documentary evidence of ownership presented. DFI never owned, planted, or sold any crops until 2018 at the earliest.

Greenpoint argues that the trial court inappropriately chose custom over legislation when it looked to common farming industry practice and implicitly found that DFI and Jason had a real or actual interest in the unharvested soybeans. Greenpoint suggests that the trial court conflated ownership of crop proceeds with ownership of the unharvested crops themselves.

Custom results from practice repeated for a long time and generally accepted as having acquired the force of law. Custom may not abrogate legislation. La. C.C. art. 3. There is legislation which addressed this issue.

Unharvested crops may belong to a person other than the owner of the ground. Nevertheless, they are presumed to belong to the owner of the ground, unless separate ownership is evidenced by an instrument filed for registry in the conveyance records of the parish in which the immovable is located. La. C.C. art. 491. No such instruments were filed in the record.

Plaintiffs counter that it is undisputed that Jason and Bobby operated a farming partnership. They argue there is no need for a recordation to

23

establish shared ownership because art. 491 is meant to instruct how to perfect a security interest. Moreover, Greenpoint knowingly sold products to Jason and DFI in addition to Bobby.

The record is clear that Jason and DFI lacked a real and actual interest in the unharvested soybeans. Although Bobby testified that he basically turned the farm over to Jason ten years earlier, and both Bobby and Jason testified concerning the division of income generated by the farm, the fact remains that Bobby and his wife owned the farmland.

In its reasons for judgment, the trial court rejected Greenpoint's argument that Dettenhaim Farms, Inc. should be dismissed as a party since it did not own the land or have an interest in the soybeans. For the foregoing reasons, the trial court erred in doing so. There was no mention of Jason's right of action in the reasons for judgment. Accordingly, we notice the exception of no right of action regarding Jason's claims and grant it. This conclusion does not affect the total damages awarded as Bobby solely recovers it.

## CONCLUSION

We amend the judgment to dismiss Robert Jason Dettenhaim and Dettenhaim Farms, Inc. as parties plaintiff from the main demand. We further amend the judgment to reduce the damage award to $134,051. As amended, the judgment is affirmed at appellants' appeal costs.

AFFIRMED AS AMENDED.